## LONG DOCK MILLS & ELEVATOR CO. v. MANNHEIM INS. CO.

(District Court, S. D. New York. July 21, 1902.)

1. MARINE INSURANCE—IMPLIED WARRANTY.

In a contract for marine insurance, a warranty of seaworthiness of the vessel insured is implied.

2. SAME—BURDEN OF PROOF.

In an action for loss under a marine policy, the burden of showing a loss within a peril insured against is on the libelant.

3. SAME—CAUSE OF LOSS.

Where a vessel insured was old and in bad condition, and was loaded with a heavy deck load, and during the night sunk at the head of a pier to which she was fastened, and it was claimed by the libelant in an action on the policy that the loss was caused by the vessel striking a hidden pile as the tide fell, but the evidence showed that at the time the vessel began to leak and sunk the tide was high and that she was probably not so injured, the libelant failed to sustain the burden of proof that the sinking was from an accident, and not from the unseaworthiness of the vessel.

Wing, Putnam & Burlingham, for libellant.

John W. Ingram, for respondent.

ADAMS, District Judge. The libellant was engaged in the grain and feed business with a place of distribution on the Harlem River, at 135th Street and Mott Haven Canal. On or about the 20th day of October, 1900, it sold a quantity of feed to be delivered at Kingsbridge on the Harlem River and the boat "A. J. Squires" was employed to make the delivery. The unloading was to be done by the purchaser and to avoid the additional expense incident to taking the cargo out of the hold, it was stipulated that it should be laden on deck. The quantity was too great for one load and it was arranged that two trips should be made. In conformity with the usual course of business, the libellant instructed its insurance agents to cover the risks, which they did by placing them with the respondent. A binder was first obtained, and then a certificate of insurance, the material parts of which are as follows:

"New York, Oct. 24th 1900.

"This is to certify that on the 22d day of October 1900 this Company insured under open Policy No. 2 made for Long Dock Mills & Elevator One Thousand Dollars on Hay, grain & feed in bags on deck. Valued at Sum Insured on board Bt. A. J. Squires. At and from Mott Haven Canal & Harlem River to Kingsbridge, N. Y. loss, if any, payable to the order of The Assured on presentation of this Certificate, and Loss to be adjusted to the holder thereof, in conformity with the conditions of the said Policy, and paid at the Office of the Company's General Agency in New York.

The Certificate represents and takes the place of the Policy, and conveys all the rights of the original Policy holder (for the purpose of collecting any loss or claims) as fully as if the property was covered by a Special policy direct to the holder of this Certificate, and free from any liability for unpaid premiums."

¶ 1. See Insurance, vol. 28, Cent. Dig. § 583.

Marine insurance, see notes to Dauagh v. The Dunbritton, 19 C. C. A. 465; Pacific Mail S. S. Co. v. New York, H. & R. Min. Co., 20 C. C. A. 357.

On the margin the following appeared:

"Conditions.

"This certificate subject to the full terms of the policy in respect of being free from claim in respect of capture, seizure, detention or the consequences of hostilities. In all cases of loss or damage there shall be deducted in lieu of average the sum of seventy-five Dollars."

The first question in the case arises with respect to what constituted the contract of insurance. The libellant contends that the foregoing is the complete contract and the respondent contends that a form of policy in use by the company should be deemed to be incorporated therein. It appears that no policy was ever written out for the libellant but it is stated in the testimony of the respondent that it was agreed the insurance was issued under the usual conditions contained in the respondent's form of Canal Cargo policy and that it was not usual to actually make out and issue formal policies in matters of this kind. The question is not without difficulty in view of some of the language employed in the certificate. Nevertheless the certificate clearly refers to a policy and the testimony seems to establish that the ordinary form of policy used by the defendant company was referred to and intended to be considered as a part of the contract. In any event, its provisions do not go much beyond what would be required of the insured under the implied warranty of seaworthiness which always attends a contract of marine insurance.

This form of policy contained exceptions against loss arising from want of ordinary care and skill in loading or navigating the boat or from the boat being unduly laden, from spilling of cargo by careening of the boat in consequence of carelessness or overloading, from not keeping the boat well pumped out from any unseaworthiness either from the condition of the boat or want of proper manning. It also provided that in case of loss or misfortune it should be the duty of the captain and crew, or those having command, to use the utmost diligence and attention to save the property.

The boat was loaded with about 53 tons of the feed on deck on the afternoon of the 23d day of October, 1900, and was then warped to a place near the end of the wharf so as to be in readiness for towing. During the night, while lying port side to the wharf, she rolled over to the starboard and sunk. She commenced to leak about 8 o'clock and sunk about 10 o'clock. A portion of the cargo was lost and the libellant sues to recover a loss of $874.21, less the sum of $75, which the contract provided should be deducted in lieu of average, alleging that the cause of the capsizing was the existence of a theretofore unknown submerged guide pile, which projected from the side of the wharf and, as the boat settled with the receding tide, pierced her planking so that she filled and rolled over. The respondent defends under the above mentioned exceptions and the implied warranty, alleging that the existence of the guide pile was or should have been known to the libellant and that the real cause of the loss was not the guide pile but the unseaworthiness of the boat and the lack of care and attention which the provisions of the policy required the

libellant and its agents to give in such a matter before it became entitled to recover. The defense, stated more in detail is, that the tide was rising from 4:30 o'clock in the afternoon and the boat did not in fact settle with the tide, but was rising with it, not only when she commenced to leak but when she rolled over; that the rolling over was caused by the leaky condition of the boat and the want of sufficient ballast as well as careless loading and lack of attention when the leaking was discovered.

The testimony with respect to the condition of the boat is conflicting. She was an old boat of the canal type and not originally designed for deck loads. A house however had been put upon her and she had been used in carrying deck cargoes, although it does not appear that she had ever carried one of the weight in question without more ballast in the hold than she had this time, which was about three tons of lumber. She had been kept in fairly good condition and it was the judgment of those who had repaired her from time to time that she was seaworthy for the purpose of transporting cargoes on the quiet waters of the Harlem River. On the other hand, she had been sold for $150 by the libellant to the captain who was in charge of her at the time of the loss, the libellant's principal witness, and some witnesses who examined her after the loss on behalf of the respondent said she was in a wretched condition; that she had been patched in places with pieces of tin cans and was unsafe to carry cargo. At the time of such examination, some weeks after the loss, she had been dragged around from one beach to another in the river and been in collision, so that her general appearance was prejudicial to her and may have affected the judgments of the witnesses adversely. Altogether, I conclude that she was one of those old boats around the harbor, which may carry cargoes safely but when any disaster happens to them which is not clearly explained, it may safely be attributed to general degeneracy. It is a case where as a matter of fact the burden of showing a loss within a peril insured against bears strongly upon the libellant. Notwithstanding her condition, however, any reasonable explanation of the loss apart from unseaworthiness, or the probable happening of any accident leading to the result, would fully meet the burden. Thus, if she did settle upon the guide pile, such an occurrence would serve to bring the case within the insurance contract. The existence of the pile is established. Shortly after the accident an examination was made of the boat which showed indications of a wound on her port bilge in a place where it might have been made by the pile. An examination was made of the pile about the same time and it showed evidence of recent contact with something. If the boat settled with the tide, it should, I think, be inferred that the pile caused a wound which led to the sinking and turn the decision in favor of the libellant. The allegations in the libel in this respect are that "During the night, as the tide fell, the Squires suddenly listed and began to leak heavily; * * * it was found that the probable cause of the damage was the existence of two projecting guide piles in the bottom of the Mott Haven Canal (which were before un-

known) upon one of which the A. J. Squires had settled with the tide by which the bottom or bilge of the boat was pierced, and the loss aforesaid occasioned"; but nothing has been pointed out in the carefully prepared printed brief submitted by the libellant, and I find nothing in the testimony, to support these allegations beyond a statement by the captain of the boat that just before the sinking he could not make out what the tide was but thought it was pretty low because the boat was just about level with the dock. Of course this proves nothing, and the other evidence tends to show that the boat did not settle with the tide but that the sinking occurred upon a rising tide. It is said that the ordinary height of the tide at this place is about half an hour later than at Hell Gate and it is undisputed that according to the Tide Tables it was high water at Hell Gate on the 23d of October at 10:16 p. m. Allowing for an ordinary rise of about 6 hours, it was low water at Hell Gate about 4 o'clock in the afternoon and therefore about 4:30 o'clock at this place. Some testimony has been adduced by the libellant to the effect that since the Ship Canal was cut to the North River, there are irregularities in the tides, and they are especially affected by high winds, but there is no evidence of anything out of the usual on this day and it is apparent that no new conditions arising out of the cutting to the North River could so greatly change the hours of the tides, that in this instance the tide was falling when it should have been rising according to its natural course. Moreover, the fact that the tide was rising was proved by the testimony of the libellant's witnesses, who said that although the boat finished loading at about 3 o'clock she could not be taken that afternoon to her destination, five miles away, because it required a high tide to take her there and they had to wait until the next morning when the tide would be right. The libellant wanted the boat to go that afternoon, but the tug master, who was to tow her, declined to take her then because she could only be taken over a bar at Kingsbridge at about high tide and it was usual to take tows over on the rising tide. The next morning at 7 o'clock the libellant took some of the cargo off the sunken boat and the tide was then rising.

It seems to be conclusively established that the tide was rising during the time the boat was lying at the place where she sunk and it is scarcely possible to reconcile that fact with the claimed injury by the pile. There is evidence tending to show that the boat was leaky and top heavy, but I do not consider it necessary to go over it in detail to account for the sinking because in the absence of evidence tending to show an accident of some nature, there is no liability on the part of the respondent. The evidence fails to sustain the libellant's theory of such an accident.

Libel dismissed.