Patrick BRINEGAR, Plaintiff,

v.

SAN ORE CONSTRUCTION COMPANY, Inc., and Gardner Engineering Corporation, a Joint Venture operating under the Name of S.O.G. of Arkansas, Defendant.

No. PB 68 C-68.

United States District Court
E. D. Arkansas,
Pine Bluff Division.

June 25, 1969.

632

Henry Woods and Sidney S. McMath, McMath, Leatherman, Woods & Youngdahl, Little Rock, Ark., for plaintiff.

Bernard Whetstone, Little Rock, Ark., John C. Shepherd, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION

OREN HARRIS, District Judge.

In this proceeding, the defendant has filed timely motion for judgment n.o.v. and to set aside the verdict of the jury returned May 16, 1969. On the pleadings, briefs and hearing June 25, 1969, the Court in denying the motion considers each of the contentions of the defendant.

This is a suit by plaintiff Patrick Brinegar alleging negligence and the statutory violation under the Jones Act as well as unseaworthiness of the defendant's vessel. The following facts are supported by substantial, and for the most part, uncontradicted evidence. S.O.G. of Arkansas, a joint venture composed of San Ore Construction Company, Inc., a Kansas corporation, and Gardner Engineering Corporation, a Texas corporation, had a contract to construct Lock and Dam No. 4 on the Arkansas River near Pine Bluff, a major component of the Arkansas River Navigation Project. Plaintiff was an oiler on its dredge "The Mud Hen". On October 19, 1968, when plaintiff was injured, defendant had completed work on seven gates of the dam and they were in full operation. The other seven gates were under construction and were surrounded by a cofferdam.

In conjunction with the work of its dredge, the defendant operated a tank vessel the "Hal-B", which had been constructed by the Gardner Engineering Corporation, one of the defendant joint venturers. This vessel carried one thousand gallons of fuel in the middle sections of its two 36 inch steel pontoons, which also provided flotation. The Hal-B was powered by a GMC 671 diesel motor seated on steel decking attached to the pontoons. The prow of the

Hal-B was square. The operator stood on a platform built over the motor.

The principal purpose of the Hal-B was to fuel the dredge, which consumed sixty-five gallons of fuel an hour. She was also used to lay the dredge discharge lines, consisting of jointed pipe floated on pontoons and to tow the dredge to different locations. In addition to towing the dredge, she also towed rock barges to points where fills were made in the dredged out river bottom. It will be seen that the Hal-B worked in close conjunction with the dredge and was actually an auxiliary vessel to it. In addition to his work as an oiler on the dredge, with responsibilities for its lubrication, cleaning and minor repairs, plaintiff Brinegar served as a deck hand on the Hal-B whenever an extra man was required on the vessel. For instance, when the Hal-B was used to run discharge pipe from the dredge out into the main channel of the river, Brinegar was used to connect the pipe sections together. He also handled the towlines on the Hal-B when she was used to tow rock barges and assisted in the fueling operations between the Hal-B and the dredge.

At about 10:00 a.m. on October 29, 1968, Travis Green, defendant's general superintendent, ordered all the completed gates on the dam closed or partially closed, except the one adjacent to the cofferdam. His purpose was to raise the up-dam water level and float several barges off the river bank. Closure of the six gates had the effect of channelling the entire flow of the Arkansas River through the one open gate. By 1:30 in the afternoon, the time of the accident, the up-dam water level had built up approximately four or five feet over the level below the dam. The flow of the water through the gate was extremely turbulent and the difference in water level made a waterfall effect in the gate.

Sometime between 1:00 and 1:30 p. m., Green gave instructions by radio to James O. Holt, operator of the Hal-B, and plaintiff Brinegar to take her through the open gate and secure an empty barrel from the men working on the cofferdam below the gate. The barrel was to be brought upstream through the open gate, filled with ice and water and returned to the men on the cofferdam for drinking purposes.

Holt, aged twenty, had been operating the Hal-B since it was brought to the job site several months before. He was not licensed in spite of the fact that under 46 U.S.C.A. § 391a the Hal-B was classified as a tankship and made subject to manning requirements promulgated by the Commandant of the Coast Guard, which specified that the operator must be a licensed master or pilot at least twenty-one years of age. 46 C.F.R. 35.05–1–10.

In obedience to the instructions of the general superintendent, Holt, with considerable misgivings, began the ill-fated voyage. With some difficulty, the downstream trip through the gate was navigated safely, and the men on the cofferdam lowered the empty barrel on a line to Brinegar, who stowed it on the boat. While the barrel was being lowered, Green talked to Holt by radio about the downstream trip through the gate, inquiring "how the boat handled in the hot water." Holt replied that, "it handled pretty good going downstream." Green then, according to Holt, told him, "well, come ahead on," or according to one of the men on the cofferdam, "go ahead and try it." The men working on the cofferdam warned Holt that he had better not attempt the up-stream trip through the gate but he replied that "he was going to try."

When the Hal-B reached the open gate on the up-stream trip, the waterfall poured into the vessel, drowning out the motor. The swift and turbulent current, combined with the waterfall in the gate, swamped and capsized the vessel. As the vessel rolled completely over in the water some part of it struck Brinegar in the neck severing his spinal cord at the C–6, C–7 level and paralyzing him below the neck.

In answer to interrogatories the jury found that the defendant was negligent,

that the Hal-B was unseaworthy and that Brinegar's injuries resulted in whole or in part from a violation of the Coast Guard regulations which required the operator of the Hal-B to be a master or a pilot at least twenty-one years of age. The jury found that Brinegar was not guilty of contributory negligence. His damages were assessed at one million dollars.

In its motion for a new trial, defendant makes no contention that the jury's finding of unseaworthiness and negligence is unsupported by substantial evidence. Indeed on these issues the evidence is overwhelming. As to unseaworthiness, the evidence may well have warranted an instructed verdict. When a vessel is sent on a voyage, the perils of which are reasonably to be anticipated and the vessel capsizes or sinks, then the vessel is unseaworthy and the owner-employer is liable as a matter of law. Walker v. Harris, 335 F.2d 185 (5th Cir.1964), *cert. den.* 379 U.S. 930, 85 S. Ct. 326, 13 L.Ed.2d 342 (1965). In the latter case an inland tug sank in the Gulf of Mexico on a journey from Ft. Myers to Carrabelle, Florida during a "northwester" of the type which could be expected to come up suddenly in the wintertime and which had 33 to 36 M.P. H. winds and 5 to 12 feet high seas. There had been no small craft warning from the United States Weather Bureau. In holding the vessel unseaworthy as a matter of law, the Court said:

> The subsidiary questions leading to ultimate conclusion of seaworthiness are therefore: what is the vessel to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or the particular fitting under scrutiny, sufficient to withstand those anticipated forces? If the answer is in the affirmative, the vessel (or its fitting) is seaworthy. If the answer is in the negative, then the vessel (or the fitting) is unseaworthy no matter how diligent, careful or prudent the owner might have been. Mitchell v. Trawler Racer, Inc., 362

U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960, AMC 1503.

The question in this case boils down then to whether winds and seas of the kind actually encountered at the fateful moment were reasonably to be anticipated.

In the case at bar, Travis Green, the general superintendent, sent the Hal-B on a voyage, knowing in detail exactly what perils she would encounter. He knew that the water in the open gate was swift and turbulent. He knew that the difference in water level had created a waterfall effect in the gate. He was very familiar with the physical characteristics of the Hal-B and the way she performed. He knew the age and inexperience of James Holt, the operator of the Hal-B. Nevertheless, he sent her on the ill-fated voyage. No new, unforeseen or intervening factor brought about the failure of the ship to navigate the open gate. Green, the superintendent, knew or should have known all the operative factors in the situation. Sabine Towing Co. v. Brennan, 72 F.2d 490 (5th Cir.1934). For other cases in which unseaworthiness was found as a matter of law in the sinking of vessels, see Watson v. Providence Washington Ins. Co., 106 F.Supp. 244 (E.D.N.C. 1952), app. dismissed, 201 F.2d 736 (4th Cir.1953) and Long Dock, Mills & Elevator Co. v. Mannheim Ins. Co., 116 F. 886 (S.C.N.Y.1902). The jury could have found unseaworthiness on the basis of the inadequacy of the operator of the Hal-B. June T, Inc. v. King, 290 F.2d 404 (5th Cir.1941). Compare Admiral Towing Co. v. Woolen, 290 F.2d 641 (9th Cir.1961) where one of the two man crew was "an inexperienced youth of high school age."

Only brief mention is necessary with respect to the allegations of negligence under the Jones Act. There is striking similarity to a leading Supreme Court case, Spencer Kellogg & Sons v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1931). In this case the defendants' launch struck ice and sank in

the Hudson River while transporting employees to work. The principal defense was that the master in charge of the launch had undertaken the trip contrary to instructions of the corporation's executive officers. The Court found that the operation was in the general charge of the defendant's works manager, Stover. In finding Stover negligent and imputing his negligence to the corporation the Court said:

> In view of the weather conditions and the observation of ice in the river some days prior to the accident by several witnesses, amongst them one of Stover's own subordinates, he should not have rested upon the mere instruction to the master not to run through ice. Before allowing the ferriage operation he was under obligation to assure himself by inquiries or by personal inspection that the Linseed King should not incur the hazard of colliding, as she did, with ice floes in the river.

In the case at bar, we did not have the mere failure to exert proper supervision to prevent negligent conduct as in Spencer Kellogg v. Hicks, *supra*. The general superintendent himself was the moving spirit in the hazardous and dangerous mission, which resulted in Brinegar's injuries.

Negligence necessary to sustain a Jones Act cause of action has been found in a vast panorama of situations. Examples of the liberal view of the Supreme Court of the United States appear in Schulz v. Pennsylvania Railroad Co., 350 U.S. 523, 76 S.Ct. 608 100 L.Ed. 668 (1956) and Ferguson v. Moore-McCormick Lines, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957).

It has been found negligent to leave a seaman suffering from delirium tremens unguarded so that he falls and injures himself, Reck v. Pacific-Atlantic S.S. Co., 180 F.2d 866 (2nd Cir.1950); to permit a drunken seaman returning from leave to fall in the ocean and drown, McDonough v. Buckeye S.S. Co.,

103 F.Supp. 473 (N.D.Ohio 1954); or to permit a fight between two seamen resulting in injury to a crewman trying to make peace, Jensen v. U. S. War Shipping Adm., 88 F.Supp. 542 (E.D.Pa. 1949) aff'd 184 F.2d 72 (3rd Cir.1950).

When Jones Act negligence is found under such factual situations as the above, it can hardly be argued that defendant's superintendent in this case was faultless in sending a small blunt nosed craft through a dam gate in which the entire flow of the Arkansas River was being channelled and which was cascading over a four to five foot waterfall. Nor was Holt, the operator of the boat, faultless in undertaking such a foolhardy voyage, even though it had been ordered by defendant's general superintendent.

In Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) the Supreme Court of the United States held that when the Jones Act incorporated the Federal Employers' Liability Act it also incorporated the theory of liability under the Boiler Inspection and Safety Appliance Acts. These Acts establish liability for injury when there is a statutory violation and causation. Proof of negligence is not necessary. In *Kernan* there was violation of a Coast Guard regulation and causation. The Supreme Court held that liability could be predicated on this combination.

■ In his motion for a new trial, defendant strongly urges that the *Kernan* doctrine is inapplicable to the case at bar and that it was error to submit this issue to the jury. I do not agree. There was clearly a violation of an applicable Coast Guard regulation. Since the Hal-B carried combustible liquid cargo in bulk not for its own use it was clearly subject to 46 U.S.C.A. 391a, which provides that such tank vessels shall be subject to manning requirements promulgated by the Commandant of the Coast Guard. Pursuant to the statute, the Commandant promulgated

the following regulation which appears in C.F.R. § 35.05–1–10:

> (a) No tankship shall be navigated unless she shall have in her service and on board either a licensed master or pilot as called for in her certificate of inspection.
>
> \* \* \* \* \* \*
>
> (c) A first-class pilot or a second-class pilot who has reached the age of 21 years may act as master or pilot in charge of the navigation of a tankship not exceeding 150 gross tons \* \* \*.

It is undisputed that the Hal-B was not in compliance with these regulations. James Holt, the operator of the Hal-B, was neither twenty-one years of age nor a licensed pilot. The jury found that there was a causal connection between such admitted violation and Brinegar's injury. Such a finding not only was permissible but entirely logical. A qualified pilot or master might well have refused to take the Hal-B on such a reckless and dangerous mission. It is certainly reasonable to suppose that a mature, licensed pilot would have remonstrated with Green and might have persuaded him to revoke his orders to take the Hal-B through the gate. The E. Madison Hall, 140 F.2d 589 (4th Cir. 1944) is directly in point. Contrary to regulations, the vessel was in charge of an able-bodied seaman instead of a licensed pilot. She struck a wreck and was lost. With reference to causation from the absence of a qualified pilot, the Court said:

> \* \* \*  He kept her on this course although he knew that a change of course either to the east or west could be safely made so as to avoid all risk of collision. It cannot be said that a qualified pilot would not have taken one of these alternatives. On the contrary, it is quite probable that such a pilot would have done so, and that all danger of collision with the wreck would have been avoided and the vessel would have passed Turkey Point on her port side and proceeded safely in a northeasterly direction up the Elk River to the Canal \* \* \*.

Refusal to apply the *Kernan* doctrine has been held to constitute reversible error. "We are unable to escape the conviction that it was error for the court not to read the regulations as requested and charge the jury they were binding in law." Provenza v. American Export Lines, 324 F.2d 660 (4th Cir.1953), *cert. den.* 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed. 2d 971. "Where, as here, there is a failure to comply with Safety and Health Regulations for Ship Repairing (29 CFR 8.1 et seq.) \* \* \* and this violation proximately results in death, there exists fault and a breach of duty which permits recovery for damages \* \* \*." (citing Kernan and Provenza, *supra*) Grigsby v. Coastal Marine Service of Texas, D.C., 235 F.Supp. 97 (1964). "the throwing of extra sacks onto the top of the pallet load in question under the circumstances then obtaining violated a Coast Guard requirement that cargo drafts be constructed in such a manner that the cargo will not fall therefrom. These regulations establish a standard of care to which all concerned must conform and a failure to conform renders a vessel unseaworthy." Anderson v. S/S Gulf Trader, 287 F. Supp. 783 at 786 (1968).

Defendant argues that it was error to hold that Brinegar was a "seaman" or "member of a crew of a vessel" as a matter of law, instead of letting the jury pass on this issue. I find this contention to be completely without merit. In Braen v. Pfeifer Oil Transportation Co., 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed. 2d 191 (1959), the Supreme Court relaxed the earlier criteria and held that two questions must be answered for a determination as to whether claimant is a "seaman." (1) Was claimant a member of a crew of a vessel? (2) Was claimant "in the course of his employment"? It is not necessary to examine question (2) since defendant admitted in its answer and amended answer that Brinegar was "in the course of his employment." With reference to question

No. (1), this evidence is undisputed that Brinegar was permanently assigned to a job as an oiler on the dredge "Mud Hen" with the additional assignment of serving as a deckhand on the dredge's tankship the Hal-B, when such assignment was required in connection with the dredge's work. Before the Supreme Court relaxed the criteria for defining the term "seaman," the classic test used to be:

1. Was the vessel in navigation?

2. Did the worker have a more or less permanent connection with the ship?

3. Was the worker aboard primarily in aid of navigation?

Even under the pre-1959 tests Patrick Brinegar would be a "seaman," since all the above test were met at the time he was injured.

■■ The Court of Appeals for the Fifth Circuit in the case of Offshore Co. v. Robison, 266 F.2d 769, 75 A.L.R.2d 1296 (1959) in an attempt to accommodate to the dynamic changes in the Jones Act cases laid down certain definitive tests for determination of the issue as to whether plaintiff is "a member of the crew of a vessel." The case involved an oil field roughneck employed on a mobile drilling platform firmly planted to the floor of the Gulf of Mexico at the time of the injury, and Jones Act coverage was upheld. The two tests to be met are as follows:

1. If there is evidence that the injured workman

(a) was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water),

or

(b) performs a substantial part of his work on the vessel.

2. If the capacity in which he was employed or the duties which he performed contributed

(a) to the function of the vessel,

or

(b) to the accomplishment of its mission,

or

(c) to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

In other words, if the above tests are met, it makes no difference whether the vessel is in navigation or not or whether plaintiff is aboard in aid of navigation and it does not matter whether he is more or less permanently connected with the vessel so long as he performs a substantial part of his work on the vessel.

The tests laid out in *Robison* were all met in the case at bar:

1. (a) He was permanently assigned to the dredge Mud Hen as an oiler.

or

(b) He performed a substantial part of his work on the dredge Mud Hen and the tankship Hal-B.

2. In the capacity in which he was employed or the duties which he performed he contributed

(a) to the function of both the dredge Mud Hen and the tankship Hal-B;

or

(b) to the accomplishment of the mission of both the Mud Hen and the Hal-B;

or

(c) to the operation or welfare of both the dredge Mud Hen and the tankship Hal-B in terms of maintenance during movement or during anchorage for future trips.

If these tests are met and there is no dispute in the facts with respect to them, the plaintiff is "a member of the crew of the vessel" (a seaman) as a matter of law. The issue should not be submitted to the jury. This is made abundantly clear by a recent decision of

the Fifth Circuit. In Producers Drilling Co. et al. v. Gray, 361 F.2d 432 (1966) the facts were as follows: Injured man was a roustabout working on a drilling barge designed to transport drilling equipment to the well site, submerge and conduct the drilling operation and then be refloated for movement to a new site. His duties included maintenance of the barge, assisting in raising and lowering the barge at the well site and participation in the drilling operations. He did not live on the drilling barge but went to work each day by boat. This injury occurred while the barge was resting on the bottom of a canal which had been dredged for the sole purpose of allowing the barge to reach the drilling site. Held—man was seaman as matter of law and not necessary to submit issue to jury. (361 F.2d 432). The court in a unanimous opinion by Circuit Judge Homer Thornberry said:

> There is no evidence that the vessel here was not being used for its designed purpose or that the seaman was not permanently attached to the vessel and performing duties which contributed to the accomplishment of its mission.

The court placed principal reliance on the decision of the Supreme Court of the United States in Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931. The court pointed out that in *Norton* the Supreme Court "found that the claimant whose duty 'consisted of taking general care of the barge' was a member of the crew of a vessel as a matter of law." It also noted that in Summerlin v. Massman Construction Co., 199 F.2d 715 (1952) the Fourth Circuit had held as a matter of law that a fireman on a floating derrick was a member of the crew of a vessel. Another court a short time later held that a gravel spreader on a barge was "a member of the crew of a vessel" as a matter of law. Wilkes v. Mississippi R. Sand & Gravel Co., 202 F.2d 383 (6 Cir., 1953). The Supreme Court of the United States denied certiorari in the latter case. 346

U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344. The same Court held that a dredge employee, whose duties were very similar to those of Pat Brinegar was a "seaman" under the Jones Act as a matter of law. Lawrence v. Norfolk Dredging Co., 319 F.2d 805 (1963). The Court pointed out that the admitted facts as to plaintiff's work leave no room for conflicting alternate inferences.

The defendant can hardly claim that the Mud Hen and the Hal-B are not vessels. The latter is obviously a vessel and under a long train of court decisions the Mud Hen is also a vessel. In Senko v. La Crosse Dredging Corp., 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957), the Supreme Court of the United States held that a dredge was a vessel. In a recent Maryland case the claimant had the exact job as Pat Brinegar. He was an oiler on a dredge. The dredge was lacking in motive power of its own and had to be towed by tugboat for all travel. Plaintiff lived at home, traveled each day to the dredge, worked an eight-hour shift and slept ashore. His duties as oiler consisted of oiling dredging machinery in the engine room. A Jones Act verdict and judgment in favor of the plaintiff was affirmed. Arundel Corporation v. Jasper, 219 Md. 519, 150 A.2d 415 (1959).

A Jones Act recovery for a deck hand on a dredge was affirmed by the First Circuit in Gahagan Const. Co. v. Armao, 165 F.2d 301 (1948) and the Supreme Court of Minnesota in Brannan v. Great Lakes Dredge & Dock Co., 253 Minn. 28, 91 N.W.2d 166 (1958) reversed a directed verdict for the defendant in a Jones Act suit brought by a deck hand on a dredge. The Second Circuit affirmed a Jones Act recovery in favor of the administrator of a one-man crew of a dredge operating in Long Island Sound. Dunbar v. Henry DuBois' Sons Co., 275 F.2d 304 (1960). The dredge was a steam derrick incapable of self-propulsion, which capsized while being towed. The same result was reached in Pariser v. City of N.Y., 146 F.2d 431 (2d Cir.1943) and in Chesser v. General Dredging Co., 150 F.Supp. 592

(S.D.Fla.1957). The Second Circuit case of Tyndall v. Conduit and Foundation Corp., 269 F.2d 947 (1959) has considerable relevance to the case at bar. Plaintiff, like Brinegar, was the member of the crew of a dredge. His employer had purchased two carfloats. While he was nailing boards to one of the carfloats to act as a buffer, the tide washed it in against his leg and severely injured him. A judgment in plaintiff's favor was affirmed. "The work on which Tyndall was engaged was maritime in nature, a seaman's work. Tyndall was injured in the course of his employment." Id. at 949. Braniff v. Jackson Ave-Gretna Ferry, Inc., 280 F.2d 523 (5th Cir.1960) illustrates that the status of a seaman is not riveted or limited mechanically to a single vessel but may exist in relation to several vessels. Such was the situation in the case at bar.

The defendant here can hardly claim that the dredge Mud Hen was not a vessel in view of certain provisions in the Statutes of the United States. Title 1, Section 3, U.S.C.A. defines a vessel as follows: "The word 'vessel' includes every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." Title 46, Section 713 U.S.C. A. also contains a definition of "vessel," reading as follows: " * * * the term 'vessel' shall be understood to comprehend every description of vessel navigating on any sea or channel, lake or river * * *." A dredge was specifically held to come within the ambit of these statutory definitions in Kibadeaux v. Standard Dredging Co., 81 F.2d 670 (5th Cir.1936). In Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L. Ed. 1047 (1907), the Supreme Court held that employees on floating dredges, such as scows, were seamen and not laborers and therefore were not covered by the eight hour law. See also The Robert W. Parson, 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed. 73 (1903); The General Cass, 10 Fed. Case No. 5,307 p. 169 (1871); Seabrook v. Raft of Railroad Cross-Ties, 40 F. 596 (D. C., 1889); Re Eastern Dredging Co.,

138 F. 942 (1905); City of Los Angeles v. United Dredging Co., 14 F.2d 364 (9 Cir., 1926).

Title 46 U.S.C.A., Section 713 defines a "seaman" as "every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board the same ('any vessel') shall be deemed and taken to be a 'seaman.'" This definition is part of the Jones Act itself and requires the broadest scope be given to the definition of "seaman." Defiore v. American Steamship Co., 110 F.Supp. 427 (W.D.N.Y. 1952). In Helena Glendale Ferry Co. v. Walling, 132 F.2d 616 (8 Cir., 1942) the Eighth Circuit held that all of the employees of the Helena, Arkansas Ferry were "seamen" except two women clerical employees, who worked entirely in the company office. Accord. Weiss v. Central R.R., 235 F.2d 309 (2d Cir. 1956). The following cases are illustrative of the broad definition given to the term "seaman" by the courts: The J. S. Warden, 175 F. 314 (S.D.N.Y.1910) (bartender); Lukos v. C & O Ry. Co., 120 F.Supp. 296 (W.D.Mich.1954) (marine labor gang); McAfoos v. Canadian Pacific Steamships, 143 F.Supp. 73 (S.D. N.Y.1956) (magician's helper); Mach v. Penn RR Co., 317 F.2d 761 (3rd Cir. 1963) (railroad bargeman); Stanley v. Guy Scroggins Construction Co., 297 F. 2d 374 (5th Cir.1961) (construction worker on special function vessel; pumped cement into pilings of off-shore drilling platform implanted in floor of Gulf of Mexico); Butwinski v. Pa. R. Co., 249 F.2d 644 (2d Cir.1957) floatman harmed aboard railroad company's tugboat); Smith v. Union Oil Co., 241 Cal.App.2d 338, 50 Cal.Rptr. 499 (1966) (deep sea diver); Chamberlain v. Shaver Transp. Co., 263 F.Supp. 47 (D.Or.1967) (land based marine engineer); Defiore v. American Steamship Co., 110 F.Supp. 427 (W.D.N.Y.1952) (watchman).

The defendant also contends in its motion for new trial that it should have been able to introduce proof that Brinegar had drawn Workmen's Compensation benefits. Brinegar's attorneys had pre-

viously entered into an agreement with defendant's then attorney that such payments would be repaid to the Compensation carrier out of any judgment or settlement obtained in the Jones Act litigation. Regardless of such agreement however, the Supreme Court has held it to be reversible error to introduce such testimony which may well affect the jury's verdict not only on damages, but also on liability. Tipton v. Socony Mobil Oil Co., 375 U.S. 34, 84 S.Ct. 1, 11 L. Ed.2d 4 (1963). See also Eichel v. N.Y. Central Ry. Co., 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963); American Fidelity & Casualty Co. v. Drexler, 220 F.2d 930 (5th Cir.1955); Altenbaumer v. Lion Oil Co., 186 F.2d 35 (5th Cir. 1950), cert. den. 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951); Burnett v. Hernandez, 263 F.2d 212 (9th Cir.1959). For a recent Court of Appeals decision where a verdict for defendant was reversed because of repeated reference to compensation payments see Mangan v. Broderick & Bascom Rope Co., 351 F.2d 24 (7th Cir.1965), cert. den. 383 U.S. 926, 86 S.Ct. 930, 15 L.Ed.2d 846 (1966). The most recent decision dealing with this problem and rejecting the same contentions made by defendant herein is American Mail Lines v. Weaver, 408 F.2d 674 (9th Cir.1969).

■ The defendant claims error in the admission of a drawing showing the Hal-B in the gate just before being swamped. The artist testified that he had prepared the drawing from the deposition given by Holt, the operator, and Brinegar, that he had read a transcript of the U. S. District Court testimony of Holt, and that the drawing was in accord with Holt's testimony at the trial. Holt himself testified:

Q Mr. Holt, you were on the stand yesterday. You were sworn and testified in this case and I just have one or two questions. Mr. Holt, I show you a drawing which has been marked Plaintiff's Exhibit No. 4 and you gave detailed testimony about the return trip of the Hal "B" to a gate on Lock and Dam 4 and I will ask you if that drawing is an accurate illustration of the situation when the Hal "B" on the trip upstream first reached the water fall and what happened when you reached what you described as the water fall is that a fair-accurate representation?

A Yes, sir, as close as you could come unless you had a camera out there with it.

This drawing was admissible under the provisions of Rule 43(a) of The Federal Rules of Civil Procedure. It would definitely be admissible under the prevailing Arkansas evidentiary rules. See Harrelson v. Eureka Springs Electric Co., 121 Ark. 269, 181 S.W. 922 (1915); Ault v. McCaughey, 173 Ark. 322, 292 S.W. 359 (1927); Mississippi River Fuel Corp. v. Senn, 184 Ark. 554, 43 S. W.2d 255 (1931); Howell v. Baskins, 213 Ark. 665, 212 S.W.2d 353 (1948); Sanders v. Walden, 214 Ark. 523, 217 S. W.2d 357 (1949).

The Federal Courts have consistently admitted evidence like the drawing admitted here. A map with markings by a witness showing location of lights was properly admitted in an FELA case. Clark v. Penn RR. Co., 328 F.2d 591 (2d Cir.1964) *cert. den.* 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964). A sketch by a witness showing position of motor vehicles at the time of the accident was properly admitted. Cohen v. Kindlon, 366 F.2d 762 (2d Cir.1966). "The general rule is that an illustrative diagram intended to portray existing facts may be employed if it is a correct portrayal of existing facts." Grayson v. Williams, 256 F.2d 61 (10th Cir.1958). In Thomas v. Conemaugh Black Lick RR, 133 F.Supp. 533 (W.D.Pa.1955) *aff'd* 234 F.2d 429 (1935), Chief Judge Gourley wrote: "It is elemental that the use of maps, models and diagrams are permissible as modes of conveying a witness's knowledge. Wigmore on Evidence, 3rd Ed., Vol. III, Sec. 791, p. 176." "It is, however, a common and proper practice in courts of justice to

receive models, maps, and diagrams or sketches, drawn on paper, or traced with chalk on a blackboard, for the purpose of giving a representation of objects and places which cannot otherwise be as conveniently shown or described by the witnesses to the jury." Western Gas Const. Co. v. Danner, 97 F. 882 (9th Cir.1899).

Sketches made by witness to illustrate type of drawing passed by him to one charged with espionage were admissible. United States v. Rosenberg, 195 F.2d 583, *cert. den.* 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 652 (1952). Charts were held admissible in tax case. Weiss v. Johnson, 206 F.2d 350 (2d Cir.1953). Blueprints of highway maps were admissible. Hart v. Grim, 179 F.2d 334 (8th Cir.1950). Blackboard sketch of farm area was admissible although not drawn to scale. United States v. D'Antonio, 324 F.2d 667 (3rd Cir.1963), *cert. den.* 376 U.S. 900, 84 S.Ct. 662, 11 L.Ed.2d 607 (1964).

The attitude of the Court of Appeals of this Circuit toward Rule 43(a) is shown by such Arkansas cases as Aetna Life Ins. Co. v. McAdoo, 106 F.2d 618 (8th Cir.1939) and Peoples Loan & Inv. Co. v. Travelers Ins. Co., 151 F.2d 437 (1945). See also the comprehensive opinion of Judge Vogel in Een v. Consolidated Freightways, 120 F.Supp. 289 (1954) *aff'd* 220 F.2d 82 (1955).

■■■ Defendant also seeks a new trial on the basis of certain remarks made by one of plaintiff's attorneys in his closing argument to the jury. There is considerable variance between the transcript and the substance of these remarks as set out in the motion for new trial and we do not find the remarks as reflected in the transcript to be objectionable. However, defendant's attorneys waived any right to interpose an objection by waiting until the jury had retired. The rule in this Circuit is crystal clear. The record "must show, either that adequate objections and exceptions to rulings thereon were taken during the argument complained of, or that such remarks were specifically excepted to

at the close of the argument." London Guarantee & Accident Co. v. Woelfle, 83 F.2d 325, 344 (8th Cir. 1936). This rule has been reaffirmed in Thomson v. Boles, 123 F.2d 487, 495 (8th Cir.1941) and St. Louis Southwestern Ry. Co. v. Ferguson, 182 F.2d 949 (8th Cir.1950).

The only instructions to which defendant's interposed objection at the trial were the Court's instructions 3B, 10 and 11–C. Instruction 10 was modified to conform to defendant's objection. Defendant objected to 3(B) on the ground that it did not also submit the issue of plaintiff's status as a seaman to the jury. Objection to 11(c) was made on the ground that this was not a proper case for the application of the *Kernan* doctrine of statutory liability under the Jones Act. These were basic contentions of defendant all during the trial and have been dealt with earlier in this opinion. The defendant offered nineteen instructions of its own and objected to the Court's refusal to give them as offered. I have examined these instructions carefully and find that most of them were covered (some verbatim) in the instructions given by the Court. Some of the requested instructions were not accurate statements of the law and some were unnecessary in view of the manner in which the issues were submitted to the jury. The Court feels that the jury was fairly and adequately instructed as to the applicable law.

■■■ In defendant's motion for a new trial, the contention is made that the damage instruction given by the Court (No. 12) authorized a double recovery for permanency and for the visible results of the injury. Since defendant made no objection to this instruction at the trial of this cause, an objection in a post trial motion comes too late to be considered. It might be pointed out, however, that the Supreme Court of Arkansas in a recent well reasoned opinion decided this question adversely to defendant. Adkins v. Kelley, 244 Ark. 199, 424 S.W.2d 373 (1968).

**642**

One matter raised by defendant in the motion for new trial has caused the Court some concern. The following allegation was made:

(a) During a recess at the close of the plaintiff's case, the plaintiff, then on a hospital cart and with his three year old daughter and his young attractive wife standing by his side, were permitted to engage in displays of affection, embracing, emotion and hysteria in the presence of the jury.

Because of the size of the verdict the Court wished to be certain that no improper influence were exerted on the jury. The motion for new trial was filed on May 23, 1969. By letter dated June 3, 1969, counsel were advised that a hearing would be held on June 25, 1969 and that the parties could introduce testimony with regard to the matters raised in the motion for a new trial. No witnesses were produced by defendant to substantiate the above allegations. Plaintiff has attached affidavits to its Response to the Motion for New Trial in which defendant's allegations are categorically denied.

The following facts, however, are known to the Court and bear on the allegations. Plaintiff was a patient in the Rehabilitation Center in Hot Springs and did not appear at the trial until the morning of the third and last day. He was brought to Pine Bluff by ambulance and taken by ambulance cot to the third floor of the Federal Building, where the courtroom is located. Outside the elevator Brinegar was transferred to a wheel chair and rolled into the courtroom to give his testimony. He testified between twenty and thirty minutes. His testimony was given in a calm unemotional manner. There was not the slightest display of emotion by him or any member of his family. Compare Delaney v. New York Central R. Co., 68 F.Supp. 70 (S.D.N.Y.1946). When the ambulance attendants rolled him from the courtroom for the return journey to Hot Springs, Mrs. Brinegar and his three year old daughter followed him out of the courtroom to a point just outside the elevators, where he was transferred to the ambulance cot. At this point they told him goodby and Mrs. Brinegar in her affidavit admits that she shed a few tears, which would have been perfectly natural. Were these events seen by the jury? The Court does not think so. The Brinegar family was completely around the corner from where the jury habitually congregated as is shown by the sketch attached to plaintiff's Response to the Motion for New Trial. Of course, there would have been not even a remote possibility of these events having been seen by the jury if defendant's attorneys had not asked for a recess just as soon as Mr. and Mrs. Brinegar left the courtroom. If defendant's attorneys had felt that there was a possibility that the jury might see Mr. Brinegar's family bid him farewell, the Court would have honored a request to have the jury remain in the courtroom until he had left the building. Such a request was not made.

The defendant also made the following allegation:

(b) The plaintiff's wife, on the closing day of the trial, and as the jury left the Courtroom, took a seat next to the aisle which the jury was required to use, where the plaintiff's wife took her child in her lap and again exchanged affections with the child and gazed soulfully into the eyes of each of the jurors as they passed single file by her seat.

This Court is in an excellent position to dispose of this allegation. The Court at all times had the Brinegar family under close observation. Besides plaintiff's wife, his parents, mother-in-law and grandmother attended the trial. His daughter was in the courtroom only on the morning of the final day. His wife and grandmother testified but by agreement of defense counsel, were excused from the rule. The conduct of plaintiff's wife was at all times exemplary. She testified factually and unemotionally. She made no outburst or shed no

tears either on the stand or in the courtroom. Her presence in the courtroom as observed by the Court was completely unobtrusive. If, however, defense counsel feared that she might exert some emotional influence on the jury by reason of her presence in the courtroom, all they had to do was to decline to excuse her from the rule. We find the allegations concerning Mrs. Brinegar's conduct in the courtroom to be without any foundation in fact.

■■■■ Defendant's last contention is that the jury's verdict was excessive. Disposition of this contention requires a brief review of the evidence. Plaintiff is 23 years old with a life expectancy of 46 years. At the time of his injury he was in good health, happily married and father of a three year old daughter. He was an excellent mechanic with a good work history, earning $9,445 per year. Over plaintiff's life expectancy and without any wage increase he would have earned $434,470 at his present rate of pay. It is undisputed that plaintiff's earning capacity has been completely destroyed. If his earning capacity is reduced to present value using a 4% discount rate the figure would be $200,846. The Vice President and Actuary of a leading life insurance company testified that a 4% discount rate would be reasonable over a 46 year expectancy. He testified that while we are now in a period of high interest rates, that cyclic variations of low and high rates can be expected over a long period. This testimony was not disputed. The actuary also gave figues for 4½% and 5% discount rates. The jury could have found, however, that the normal increase in earning capacity, as a young man acquires more experience, along with inflation, could have offset any reduction to present value. The jury could have reasonably found that Brinegar would have earned much more than $434,470 over his life expectancy, since the latter figure assumes that his salary and earning would never increase and that dollar values would remain at their present level. The jury is not required to make such

an assumption. Grunenthal v. Long Island R. R., 393 U.S. 156, 80 S.Ct. 331, 21 L.Ed.2d 309 (1968).

The major economic damage sustained by Brinegar, however, is the cost of his routine care and medical attention. His injuries are indeed catastrophic. He is hopelessly and permanently paralyzed below the neck. He has no control of his bowels and bladder. He is impotent. He is now bedridden. He is unable to sit upright but must lie face down on a surf board type of wheel chair.

The administrator of a nursing home which specializes in the care of quadriplegics testified that Brinegar's routine care would cost $26,437 annually. Over his life expectancy this would amount to $1,216,102 or $562,178, reduced to present value at a 4% discount rate.

Brinegar's three treating doctors all testified at the trial, a neurosurgeon, orthopedist, and internal medicine specialist. They agreed that all of his life he would be faced with recurring kidney, lung, and skin problems, which would require frequent periods of hospitalization and specialized treatment. The cost of such hospitalization and specialized treatment was estimated to be approximately $15,000 per year. Over Brinegar's life expectancy this figure would amount to $690,000, or $318,972 reduced to present value. To the date of trial Brinegar's medical expenses were $19,004 and his past wage loss was $5,115. Even with a reduction to present value, there is competent evidence in the record that Brinegar's past and future wage loss and past and future medical expenses would amount to $1,106,115.

This figure, which is in excess of the jury's verdict, is reached without any consideration being given to the "intangible" elements of damage, which in Brinegar's case must be accorded great weight. His pain, suffering and mental anguish (particularly the latter) could justify a substantial portion of this verdict. The Supreme Court of the United States recently held, in restoring a jury verdict reduced by the Court of Appeals,

that $150,000 could be reasonably allocated to pain and suffering by a verdict of $305,000 for a crushed foot. Gruenthal v. Long Island RR, *supra*.

An even greater sum could be justifiably awarded for the permanency of his injury—the almost complete loss of bodily function. The loss of the ability to enjoy life's non-work-connected activities are embraced within this element of damage—the loss of the ability to enjoy sports, to take his daughter for a walk, or to the circus, or to church. Brinegar can never again drive an automobile or engaged in his principal hobby, which was building racing cars. His wife, once a loving companion, must now become his lonely nurse. In a case where most of the recovery seems to have been for the permanency of the injury, the Court of Appeals for this Circuit has just affirmed a $500,000 award entered by Judge Davies, sitting without a jury. Stromsodt v. Parke-Davis & Co., 257 F. Supp. 991 (D.N.D.1966) aff'd 411 F.2d 1390 (8th Cir.1969). In this case an infant, plaintiff, was given a drug which damaged his brain.

Apparently no attempt was made to prove loss of earning capacity and the medical expense would appear to be slight, as he is being cared for at his home. The major component of Judge Davies award seems to have been the permanency of the injury.

Besides the intangibles of pain, suffering, mental anguish and permanency of the injury, the jury was instructed that Brinegar was entitled to recover for the visible nature of his infirmities. When all these intangibles are considered, the jury could justifiably give them equal or even greater weight than the economic losses sustained by this young man.

If we apply the legal principles enunciated by the Supreme Court to the evidence in this case, it is readily apparent that there is no justification for a remittitur. The landmark case is Barry v. Edmunds, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729 (1886) where the Court stated that in "actions for torts where no pre-cise rule of law fixes the recoverable damages, it is a peculiar function of the jury to determine the amount of their verdict." The Court then went on to quote Justice Story's opinion in Whipple v. Cumberland Manufacturing Co., 2 Story 661, 670, 29 Fed.Cas. No. 17,516, p. 934:

> A verdict will not be set aside in a case of tort for excessive damages, unless the court can clearly see that the jury have committed some very gross and palpable error, or have acted under some improper bias, influence, or prejudice, or have totally mistaken the rules of law, by which the damages are to be regulated. * * * unless the verdict is so excessive or outrageous, * * * as to demonstrate, that the jury have acted against the rules of law, or have suffered their passions, their prejudices, or their perverse disregard of justice, to mislead them.

This case was expressly reaffirmed in the recent case of Affolder v. N. Y., Chicago & St. Louis Railway Co., 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683 (1950). In the latter case it was indicated that a jury verdict should be reduced only if it was "monstrous." See also the 1968 case of Grunenthal v. Long Island R. R. discussed *supra*.

Also pertinent is the decision of the Court of Appeals for the District of Columbia in Taylor v. Washington Terminal Co., 133 U.S.App.D.C. 110, 409 F.2d 145 (1969). The jury returned a verdict for $80,000. The trial judge ordered a remittitur of $60,000, which plaintiff refused to accept. On the second trial, plaintiff received a verdict for $25,000. On appeal from this verdict the first verdict of $80,000 was restored, the Court remarking that "where as here it is clear that the jury has stayed within the reasonable range, the deference due its findings of fact outweighs the deference due the trial judge's first hand review of the evidence."

"As this Circuit has frequently reiterated, while an award may be high, it

should stand if there is ample evidence to justify it. It is not my prerogative to arbitrarily substitute my judgment for that of the jury." Jamison v. DiNardo, 195 F.Supp. 99, 102 (W.D.Pa. 1961) *aff'd* 302 F.2d 27 (3rd Cir.1962). "(A)ny claim that the verdict has been excessive requires a trial court to decide no more than whether the jury has reached a result which could rationally and dispassionately be reached by laymen on the basis of evidence relevant to the several categories of legally recoverable damage." Lebeck v. William A. Jarvis, Inc., 250 F.2d 285, 288 (3rd Cir. 1957). "(T)he view most favorable to the plaintiff must be inferred from the evidence, if there is substantial evidence to sustain the verdict it will not be disturbed." Handy v. Reading Co., 66 F. Supp. 246 (E.D.Pa.1946). "When there is any margin for a reasonable difference of opinion in the matter, the view of the Court should yield to the verdict of the jury, rather than the contrary." Jones v. Atlantic Refining Co., 55 F. Supp. 17, 20 (E.D.Pa.1944). "Where the amount of the verdict bears a reasonable relationship to the character and extent of the injury and damage sustained, it is not excessive." Wright v. Charles Pfizer & Co., 253 F.Supp. 811, 813 (D.S.C.1966). "It is equally clear that the District Court substituted its judgment for that of the jury's. That it is violative of the Seventh Amendment to the Constitution of the United States for a court to so invade the province of a jury is so fundamental that it need not be supported by citation." Korbut v. Keystone Shipping Co., 380 F.2d 352, 354 (5th Cir.1967). "(W)here a motion is made upon the ground that the verdict is excessive, the verdict should not be set aside unless it shocks the conscience of the Court." Malone v. Montgomery Ward & Co., Inc., 38 F.Supp. 369, 370 (D.Miss.1941). "It is so difficult to evaluate pain and suffering. It is perhaps less difficult to evaluate loss of earnings but even upon that subject the duration of injuries is sometimes problematical. Certainly there should be no interference with a jury's verdict where the evidence is sufficient, as here, to sustain its finding. Perhaps another jury or a judge might have reached a different result but that is not the test." Warf v. Penn R. Co., 65 F.Supp. 631, 632 (E.D.N.Y.1946). "In the absence of a showing that a verdict of the jury is the result of passion, prejudice, or sympathy, where there is substantial evidence in the record to support the award, it would be an unwarranted interference by me with the constitutional right to trial by jury for me to substitute my judgment for that of the jury." Marchant v. American Airlines, 146 F. Supp. 612 (D.R.I.1956). "Unless the jury awards something fantastic for this sort of harm (FELA Injury) it is hardly subject to modification by a reviewing court." La France v. N.Y., N.H. & Hartford RR Co., 292 F.2d 649 (2nd Cir.1961). "What constitutes an excessive verdict is not to be tested by the sum that the judge would have awarded had he been trier of the facts." Preston v. Safeway Stores, 163 F.Supp. 749, 753 (D.C.Dist.1958). "The court is not free to reweigh the evidence and set aside the jury's verdict merely because the jury could have drawn different inferences or conclusions, or because the court regards another result as more reasonable." Draper v. Erie R. R., 183 F.Supp. 899, (W.D.Pa.1960).

The above quotations, mainly from the opinions of United States District Judges, demonstrate the impropriety of any reduction in the amount of the damage verdict in this case. It can hardly be argued that there was an absence of substantial evidence to support the award under the plaintiff's evidence, given by reputable physicians and expert witnesses. Brinegar's economic losses alone will exceed the amount of this verdict. It can hardly be said to "shock the conscience" when this record reflects a settlement offer by defendant during trial in the amount of $475,000. While the verdict is large, it is not unprecedented. A Florida Court of Appeals has just affirmed a $1,500,000 verdict for a

35 year old quadriplegic housewife with injuries strikingly similar to those of Brinegar. Talcott v. Holl, Fla.App., 224 So.2d 420 (3rd Dist.1969). See also Christopher v. United States, 237 F.Supp. 787.

The motions for judgment n.o.v. and to set aside the verdict of the jury are denied and judgment will be entered in plaintiff's favor in the amount of one million dollars.