Mrs. Catherine SPILLER, a Widow, as Administratrix of the Estate of L. Roy Spiller, Deceased, et al., Plaintiffs,

v.

THOMAS M. LOWE, Jr. and ASSOCIATES INC., Defendant,

Mrs. Dorothy Norman Davis, Intervenor.

Civ. A. No. T-70-C-2.

United States District Court,
W. D. Arkansas,
Texarkana Division.

June 11, 1971.

Tackett, Young, Patton & Harrelson, Texarkana, Ark., John K. Dunlap, Atlanta, Ga., for defendants.

Arnold & Arnold, Texarkana, Ark., Newman & Smith, Harkness, Friedman & Kusin, Texarkana, Tex., for plaintiffs.

## AMENDED AND CORRECTED MEMORANDUM OPINION

PAUL X WILLIAMS, District Judge.

On May 8, 1969, the Defendant, Lowe and Associates, was engaged in engineering, mapping and surveying activities on the Red River within the Western District of Arkansas, Texarkana Division, pursuant to a Contract entered into on or about May 22, 1968, with the United States Army, Corps of Engineers, New Orleans District. The Defendant is a Georgia Corporation, with its principal office in Atlanta, Georgia, whose corporate purposes include the mapping and surveying of navigable bodies of water within the continental United States. The Contract called for the work to be performed from mile 230 to mile 436 of Red River. The Defendant had previously completed a similar contract calling for such work below mile 230.

The completed work product of the Defendant consists of a volume of maps which was introduced in evidence. The maps show the location of the River and provide data regarding its depth, and the elevations and locations of its banks. In order to obtain the information needed, it was necessary for the Defendant to hire numerous employees, including the Plaintiffs' decedents, L. Roy Spiller, age 20, John Winston Smith, age 19, James Louis Dollarhide, age 23, and William H. Davis, age 24, all of whom were Negroes. The defendant divided its employees into three types of crews, with each to perform a part of the work.

Mr. Fred Schmid was designated by the Defendant as its field supervisor and was in charge of the crews. One of Mr. Schmid's functions was to set out pipes on the riverbank at intervals in order that the crews would be able to locate themselves in the performance of their work. There were three types of crews: one for setting out stakes on the river bank at 500 foot intervals, these locations being referred to as ranges; one for the taking of soundings to determine the depth of the River; and overbank crews, whose function was to determine elevations at 50 foot intervals along the range lines away from the banks.

The individual employees of the Defendant were assigned to a specific crew and each crew had its own party chief, boat and equipment.

John Winston Smith and William Davis were regularly assigned to the sounding crew, whose party chief was Charles Crockett. L. Roy Spiller and James Louis Dollarhide were regularly assigned to the stake crew, whose party chief was Lamar "Skip" Blalock.

The boats were used by each crew for transportation from one work site to another, as well as being used for transportation to and from the point of departure. The sounding crew utilized a device for the purpose of measuring the depth of the water, and it was necessary for this work to be done primarily on the water. In the case of the staking crew and overbank crew, the boat was further utilized in transferring equipment and men from one bank of the River to the other, as required. A substantial part of the work of members of overbank section crews was also done on the water or was related to the maintenance and operation of the boat assigned to those crews. The use of the boats was required in the performance of each crew's work, and constituted an integral part thereof.

The Defendant had six boats which were used on the River. The one in-

volved in this case was a 16 foot aluminum flat bottom boat manufactured by Ouachita Boat & Marine, Incorporated, being model number 16 SDW. This particular boat was purchased in the Summer of 1967, together with a sister boat. These two boats were similar to the remaining four boats utilized by Defendant, except they did not have flotation material underneath the front deck.

The manufacturer's rating for the boat in question was as follows:

"This boat is built to accommodate under normal conditions an outboard motor of not more than 35 OBC certified horsepower and 5 persons at 150 pounds per person or a properly located maximum weight of 1,080 pounds for persons, motor and gear. This boat meets all State flotation requirements. Arkadelphia, Ark."

On the morning of May 8, 1969, the Defendant maintained its field office in Texarkana, Miller County, Arkansas. The work had progressed on Red River to a point near Fulton and above. The party chiefs were to arrive at the field office at 7:30 A.M., in order to receive instructions from Schmid, and the men were to arrive at 8:00 A.M. Since Charles Crockett had reported in ill, Schmid assigned his crew members, John Winston Smith and William Davis, to Blalock's crew. Blalock's crew normally consisted of L. Roy Spiller, James Louis Dollarhide, and William Warren. His crew now consisted of six men.

At this time, Schmid was unaware that the River was on a rise and that the water was swift and dangerous. The evidence shows that the River had risen from 13.2 on May 7, 1969, to 16.6 feet on May 8, 1969, at 8:00 A.M.

After the crew had left, at about 9:00 A.M., Schmid left Texarkana by truck for Montgomery, Alabama, without having appointed anyone to be in charge during his absence. In passing over the bridge at Garland, Arkansas, he observed the condition of the River. He stated it was as high as he had ever seen it. Nevertheless he proceeded on to Montgomery. The River continued to rise throughout the day of May 8, 1969.

Blalock took his five crew members to a point near mile 410 on the South bank of Red River on the Harper farm. At this time, the River was swift and extremely dangerous. The boat in question had been left on the river bank at this point the night before, tied to an iron stake with a rope approximately 200 feet long. Upon arrival, the water had risen and the bank had caved in on top of the boat. The boat was submerged and full of mud and debris. It was necessary for the six men to obtain assistance from another crew, whose party chief was T. R. Bradley, to retrieve the boat from the water. The front of the boat was dented from the cave-in. All of the mud and debris could not be removed from under the deck of the boat. Under Blalock's direction, his crew loaded the boat with their equipment, including six life jackets furnished by Defendant, and all of them got in the boat and proceeded into the River and downstream. Three of the men, including Warren, were let out of the boat to perform overbank work and the remainder went to another point on the River to perform work. The River continued to rise during the day, and at 4:00 P.M., the stage at Fulton was 18 feet. At about this time, Blalock returned with his two men to pick up the three remaining men. Blalock then proceeded upriver to return to the truck. The evidence shows that at this time the River was very swift and was full of debris, whirlpools, floating logs, and underlogs. The underlogs are described as trees which were below the surface of the water, ranging in size to large trees, and which would frequently shoot out of the water with great force.

The evidence is conflicting as to exactly what occurred but the evidence is clear that the boat capsized and all the men were thrown into the water. The boat turned over, the front end was submerged, and only the stern and propeller of the motor could be seen above the surface of the water. Warren, a white

58

man, managed to swim ashore. While in the water, he last saw Blalock, the only other white man, hanging on to the stern of the boat, and Smith, who was wearing a life jacket, hanging on to Blalock's neck and crying for help. Warren testified that Dollarhide, who was also wearing a life jacket, went underwater and did not come up, and that he last saw Spiller and Davis trying to hang on to the side of the boat. Warren swam, or was carried by the current, to the North bank of the River. He heard the men yelling and in a state of panic, while he was in the water, but when he reached shore and looked back, he could not see the men, boat or any gear. He estimated that it required him five minutes to get to shore.

Although extensive rescue operations were later conducted, the body of Smith was not found for several days and the body of Davis was not found until 28 days later. The bodies of Spiller, Dollarhide and Blalock were never found. Neither of the bodies recovered was found with life jackets. The bodies were found far downstream. Other equipment, presumably from the boat, was found about 5:00 P.M. by John Cunningham, Jr., a commercial fisherman, approximately 4 miles South of Fulton. This included a gas tank, water can, and range pole.

Since this action is in admiralty, the first thing to be determined is whether Red River at the area in question was and is a navigable stream. If it is not, then this case can not be maintained.

■ The Court finds that it was and is a navigable stream under the evidence and the applicable law. The parties to this action have developed the facts thoroughly and point out that Red River at the point in question has been considered a navigable stream from the earliest times. In the case of Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L. Ed. 771 the United States Supreme Court held:

"the [Red] river was known to be navigable from its mouth to near the Eastern boundary of Oklahoma." 258

U.S. 586, 42 S.Ct. 411, 66 L.Ed. at 776, and that "Lanesport, Ark., which is near the Oklahoma boundary, has been the usual head of navigation." 258 U.S. at 589, 42 S.Ct. 412, 66 L.Ed. at 778.

Lanesport is a community in Little River County, Arkansas, located upstream from Fulton and the Index bridge, three-fourths of a mile from the Oklahoma line. The site of the accident in this suit was between Fulton and the Index bridge and, thus, is well within the area of the River that has been determined to be navigable by the United States Supreme Court.

Historical material found in *Memoirs of Southern Arkansas*, published in 1890, Chapter XVI pertaining to Miller County states:

(1) But there may still be recalled the fact that Sulphur Fork and Red River furnish navigation along their entire length through the County * * * (At page 181.)

(2) The war, however, stopped things of this kind and it was not until the Fall of 1873 that it was completed and trains began running in December. Up to this time the River had done the business, and freight on cotton bales ranged from $2.00 to $25.00. (At page 184.)

(3) Boats ran from January to June and stopped at every planter's landing, except for a time when a raft blockade occurred near the Louisiana State line, when upper river boats were used above it. This was about 1842 or 1843, before the great overflow of 1849. (At page 185.)

Statutes enacted by Congress authorized railroad bridges at Index, contain specific direction requiring the bridges to be built in a designated manner that is clearly intended to preserve the navigability of the River. The Act of May 1, 1888, Ch. 209, 25 Stat. 105, requires the bridge to be constructed with a pivot or draw, or to contain a span at least 200

feet between piers over the main channel of the River with a clearance of at least 80 feet at low water and 50 feet at high water. The Act of January 20, 1897, Ch. 69, 29 Stat. 492, requires the bridge to be constructed as a drawbridge.

The evidence adduced clearly shows that Red River is and was navigable. Albert C. Moore testified that he had lived near Red River for a period of 45 years and had been engaged in commercial fishing on Red River for 25 years. The specific portion of Red River in which he now fishes is from Index to Fulton, which covers approximately 12 miles of the River and includes the situs of the accident. Moore further testified that he sold his fish in Texarkana and in Ashdown and that the fish were sold to customers in Oklahoma, Louisiana, Arkansas, and Texas. He identified other commercial fishermen presently using this section of the River as being Archie Merrell, Clarence Merrell, George Merrell, John Cunningham, Jr., Earl Clayton, John Paradise, and James Allen. He also testified that a barge, also called a launch, was brought up the River from Shreveport in 1956. It was about 35 feet long with powerful diesel motors. The witness further testified that the United States had operated snagging boats for the purpose of making the River easier for navigation. These boats went up at least as far as Lanesport, Arkansas. Cotton was loaded there on steamboats. Steamboats also carried passengers for hire. The witness had been fishing the River in the area where the accident occurred on May 8, 1969, and lost equipment due to the rise and condition of the River.

John Cunningham testified that he had been engaged in full-time commercial fishing for twelve years, and often fished the River between Index and Fulton.

G. W. Yauger testified that he was born in 1888 in Old Lanesport, and he lived there until he was five years old. His father, Henry Yauger, was a farmer and ginner. There was a boat landing on the Red River 100 yards from where he lived. Riverboats made regular trips there. These were steamboats which hauled cotton, cottonseed, and some cattle. Some of the boats went to Denison and would come back loaded. The witness further testified that there was a boat landing at Richmond, which is between Foreman and Ashdown, and, in fact, there were landings all along the River.

Eugene W. Bower is a member of a pioneer family of Clarksville, Texas. He was born in the year 1896. His father was born in 1853. His grandfather came to Clarksville in the year 1845. The witness formerly was the District Clerk of Red River County, as well as his father before him. He is familiar with the history of Red River navigation, based upon the reputation and common knowledge of the community. He is the author of *"Red River Dust,"* and Chapters 18 and 22 show aspects of Red River navigation in the past. The witness identified material from the *Clarksville Standard* showing the use of steamboats for transportation of goods and passengers.

Mr. Claude Wilson testified as to the use of the River during his lifetime. Mr. Wilson was born in 1891 and was an engineer on the *Ellen*, which was built in 1909 at Fulton, Arkansas. This boat worked for a short period of time out of Arthur City, which is about 190 miles by water above Fulton. Afterwards, she was brought back down the River to Fulton and worked there for ten or twelve years hauling supplies to levee camps for men who were building the Miller County levee, on location being halfway to Index from Fulton. She also hauled lumber, oats, and other material, and this continued for ten to twelve years. The witness also referred to other steamboats that had worked as snag boats on the River before 1909, including the *Columbia*, *C. W. Howell*, the *Culberson*, and the *Denison*, and also the use of quarter boats. He also testified that in about 1900 the *Annie P.* took a cargo of syrup from New Orleans to Denison. In this connection, Plaintiffs offered additional proof of navigability

in that the Corps of Engineers recognized that Red River is navigable. This is evidenced by the Corps of Engineers publications listing the bridges at Garland, Arkansas, Fulton, Arkansas, and at Index as being "Bridges Over the Navigable Waters of the United States," in the publications of 1927, 1941, and 1961. Navigability is further reinforced historically by the 1891, 1892, 1893, and 1895 reports of the Secretary of War, and the authenticated 1935 letter from the Chief, House Document No. 378, 74th Congress Second Session, which set out data pertaining to the use of the River, including freight tonnage and revenues.

In the case of Appalachian Electric Power Company v. United States, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940) which involved the New River in Virginia and West Virginia, which was not presently being navigated, but which had been used in 1873 by flat bottomed boats, the Court held that any river that had ever been used for commerce retained its navigable status for purposes of federal jurisdiction: "When once found to be navigable, a waterway remains so." 311 U.S. at 408, 61 S.Ct. at 299. A recent case, summing up the law which has remained substantially unchanged since *Appalachian Electric Power Company*, is Rochester Gas & Electric Corporation v. FPC, 344 F.2d 594 (2d Cir. 1965), where the Court said that a river is navigable

> If (1) It presently is being used *or is* suitable for use, or (2) It has been used *or was suitable for use in the past,* or (3) It could be made suitable for use in the *future by reasonable improvements* (emphasis in original). Id. at 596.

In pioneer days the Red River, at the location in question, was a chief route for movement of commerce. Doubtless the Denison dam and the Millwood dam have operated to curb the dangers of flood and have caused more sand bars and snags in the river, but the Court finds that, at the point in question, the Red River was and is still a navigable stream.

Having determined as a fact that the deaths occurred on a navigable stream at a point in the State of Arkansas, we have precedent for further guidance in the case of Brinegar v. San Ore Construction Co., 302 F.Supp. 630 (8 Cir., 1969) a case from the Eastern District of Arkansas, but presided over by Honorable Oren Harris, Chief Judge of this Court.

The make shift type of water craft in the Brinegar case was held to be a "vessel".

1 U.S.C. § 3 defines a vessel as follows: "every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water"; and 46 U.S.C. § 713, Table A defines vessel as "every description of vessel navigating on any sea or channel, lake or river."

Here each of the plaintiffs' decedents piloted the motorboat on occasion, a substantial part of the survey crew's work was performed on the water, and each member of the crew had lookout and other duties to aid in navigation. See also the comprehensive discussion in Woods, The Law's Concern for Those That Go Down to the Sea in Ships: Brinegar v. San Ore Construction Co., 23 Ark.L.Rev. 567, 568–76 (1970); Kolius & Vickery, Maritime Employees' Remedies Against Employers, 23 Ark.L.Rev. 192, 197–201 (1969).

The use of the vessels was required by the work and constituted an integral part thereof. Each crew had its own party chief, vessel and equipment. Smith and Davis were regularly assigned to the sounding crew, whose work required the use of its vessel in determining the depth of the River. Spiller and Dollarhide were assigned to the staking crew, and their vessel was regularly used to transport its men and equipment from one side of the River to the other. Additionally, each crew, including overbank section crews, used its vessel to move from one work site to another, as well as to and from the point of departure.

The Court finds as a fact that the boat in this case was a "vessel."

■ And since the boat was regularly used not only in going to and from their places of work, but also in the actual performance of their work we have no doubt but that each man was a seaman within the meaning of that word in an admiralty case. Each decedent had operated the boat on occasion and each performed duties in loading and unloading the craft and keeping lookout while underway.

We now come to the matter of determining whether or not the vessel was seaworthy under the circumstances that existed in this case.

■ Generally speaking, a vessel is said to be unseaworthy when it or its gear and appliances are not reasonably fit for their intended use. See Saunders v. Pool Shipping Company, 235 F.2d 729 (5th Cir. 1956) and Texas Menhaden Company v. Johnson, 332 F.2d 527 (5th Cir. 1964). As to whether the Plaintiffs are entitled to recover under their cause of action stated in admiralty, they must only show that the vessel and/or its equipment were unseaworthy. The doctrine of unseaworthiness imposes strict liability on the owner who has an absolute duty to furnish a seaworthy vessel. See Fall v. Esso Standard Oil, 297 F.2d 411 (5th Cir. 1961). The questions to be asked in determining whether a vessel is unseaworthy are:

(1) What is a vessel to do?

(2) What are the hazards likely to be incurred?

(3) Is a vessel sufficient to withstand these hazards?

If the answer to the third question is in the negative, then the vessel or its appurtenances are unseaworthy no matter how diligent, careful, or prudent the owner might have been. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, and Walker v. Harris, 335 F.2d 185 (5th Cir. 1964), cert. den., 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342. It is clear that the boat was intended to be used upon the Red River by the Defendant, both in the accomplishment of its work and as transportation to and from work sites and its debarkation point. It is equally clear that the hazards likely to be incurred in the Red River include swift water, floating logs, debris, underlogs, sandbars, and whirlpools. That Defendant knew of these hazards is shown by the testimony of L. E. Whittington, its secretary, and Fred Schmid, its field supervisor. The Defendant had, or in the exercise of ordinary prudence, could have obtained, knowledge of the extremely hazardous condition of the River on the day in question. This is well documented by the testimony of Mr. Whittington and Mr. Schmid, and by Mr. Hogatt and Mr. Langlois of the U. S. Corps of Engineers.

As to whether the vessel was sufficient to withstand these hazards, one need only to look to the undisputed fact that it sank and remained submerged for nearly one month until the water had receded to a point where one corner could be seen according to the testimony of Mr. Schmid and Sheriff Leslie Greer.

The evidence further shows that the bow on the boat in question was caved in due to its having to be retrieved from the water from a bankslide that day, and that there was mud and debris which could not be removed from under the deck of the boat. Further evidence shows that tests performed by Mr. Schmid on the vessel in question were unsatisfactory, the boat having submerged three or four feet below the surface in calm water when he stood up in it with a simulated weight of 89 pounds on its transom.

It is stipulated by counsel and admitted by Defendant's attorney that the vessel in question contains a manufacturer's plate affixed thereto which states:

"This boat is built to accommodate *under normal conditions* an outboard motor of not more than 35 OBC certified horsepower and *5 persons at 150 lbs. per person or a properly located maximum weight of 1,080 lbs. for persons,* motor and gear." (emphasis supplied).

The boat was overloaded both as to number of men and the maximum weight according to any construction of the evi-

dence. According to the testimony of Albert Moore, Ted Bedsole, and Defendant's own witness, John Cunningham, it is dangerous to place too many men in a boat, as well as to overload with weight. It is particularly dangerous to overload with men, since the center of gravity is raised, and the likelihood of capsizing is increased because movement of the men can be expected, particularly on an extended ride in swift water containing floating objects. There is no question but that there were six men in the boat instead of five, according to the undisputed testimony of Billy Warren.

The gross weight of the men, motor, and their gear exceeded 1,080 pounds, the only conflict being as to how much the maximum permissible weight was exceeded. Fred Schmid itemized the equipment which he stated would have been in the boat at the time in question and gave the weight of each of them. The figure he gave was 220 pounds. That figure, when combined with the weights of the Plaintiffs decedents, Warren and Blalock, as shown on their employment application, shows a gross weight for the men of 928 pounds, a total of 1,148 pounds. Thus, in the light most favorable to the Defendant, the maximum weight limitation was exceeded by 68 pounds. This overloading alone constitutes negligence even if normal conditions, i. e., calm water, existed. Furthermore, the testimony of Warren shows that there was considerable more equipment in the boat than Defendant's witnesses admit. He testified that there was between 441 to 501 pounds of equipment placed in the boat, making a gross weight of 1,369 to 1,429 pounds.

Further bearing upon the fact that the vessel in question was overloaded, is the testimony of Fred Schmid, Sheriff Greer, Mr. Hoggatt, Ted Bedsole, Albert Moore, John Cunningham, Billy Warren, and Will Carl Withem, that the River conditions were far from normal. Fred Schmid stated that the River was as high as he had ever seen it.

■ The duty to maintain a seaworthy vessel is exacting. The concept of unseaworthiness is a form of absolute liability. The duty is nondelegable, and the exercise of due diligence is no defense. Liability attaches even if Defendant is entirely free of negligence or other faults. E. g., Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Brinegar, supra, 302 F.Supp. at 634; Woods, supra, 23 Ark.L.Rev. at 584–90; Kolius & Vickery, supra, 23 Ark.L.Rev. at 207–10. As Judge Harris said in Brinegar, 302 F. Supp. at 634: "when a vessel is sent on a voyage, the perils of which are reasonably to be anticipated and the vessel capsizes or sinks, then the vessel is unseaworthy and the owner-employer is liable as a matter of law" (emphasis supplied). Defendant sent out the vessel, damaged and overloaded and it sank. The unseaworthiness concept has been correctly described as "a sort of seagoing res ipsa loquitur." Walker v. Harris, 335 F.2d 185, 193 (5th Cir. 1964), cert. den., 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1965).

■ Considering what the boat was being used for, the hazards that were apparent and the overloading with men and material, the Court finds that the vessel was unseaworthy.

The Court finds no gross negligence, but ample proof that the vessel was "unseaworthy" as that term is used in admiralty suits and that the unseaworthiness caused the deaths of the decedents.

The plaintiffs assert three causes of action, but in view of the findings of the Court as set out above, only the claims based upon wrongful death caused by unseaworthiness are treated by the Court in this action. We cite the case of Moragne v. States Marine Lines Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) in which the United States Supreme Court flatly held that an action for wrongful death can be maintained under general maritime law for death caused by violation of maritime duties.

■ The present actions are brought in the names of the duly appointed, qualified and acting Personal Representatives

of the estates of the 4 deceased persons. The *Moragne* case did not announce guide liens to cover all the practicalities that arise in enforcing the remedies made available by the doctrine announced, but in the present actions the work of the defendant and the deceased persons on this particular job was entirely in Arkansas; the deaths occurred in Arkansas and the suits are being maintained in Arkansas. In this case the Court finds it proper that each case be maintained in the name of a qualified Personal Representative for the benefit of whomever is entitled to recover damages for the wrongful death. The Arkansas Wrongful Death Act gives us satisfactory guidelines for these particular cases which arise in Arkansas on inland navigable waters of Arkansas.

Each of the 4 deaths gives rise to a different evaluation on the matter of damages.

## DOLLARHIDE

James Louis Dollarhide was born December 11, 1945. He was survived by the following persons, with life expectancies as indicated.

| Widow | Carolyn | 46 years |
| Stepchild | Antionette | 64 years |
| Father | Joseph | 24 years |
| Mother | Creola | 25 years |

He was a high school graduate and had one year at Texarkana Junior College and one year at Prairie View A & M. He was married to Carolyn April 23, 1969 and assumed the duty of supporting Antionette to whom he stood in loco parentis. He contributed regularly to the support of his parents. His salary was $4,160.00 per year.

The Court finds that the Personal Representative of his estate should recover the following amounts from the defendant:

| For the Estate of deceased | $15,000.00 |
| For the widow, Carolyn | 50,000.00 |
| For the father, Joseph | 15,000.00 |
| For the mother, Creola | 15,000.00 |
| For the stepchild, Antionette | 15,000.00 |

## SPILLER

L. Roy Spiller was born August 29, 1948. He was survived by the following persons, with life expectancy as indicated:

| Widow | Catherine | 49 years |
| Child | Jeffrey | 64 years |
| Mother | Elemma | 25 years |

He did not finish high school but dropped out in 1968 to help support his mother to whom he contributed most of his earnings until he married Catherine in December, 1968. He and his wife moved in with his mother and lived with her for a time. At the time of his death he was still contributing to his mother's upkeep. His salary was $4,160.00 per year.

The Court finds that the Personal Representative of his estate should recover from the defendant the following amounts:

| For the Estate of deceased | $15,000.00 |
| For the Widow, Catherine | 50,000.00 |
| For the Child, Jeffrey | 40,000.00 |
| For the Mother, Elemma | 15,000.00 |

## SMITH

John Winston Smith was born May 16, 1949. He was survived by the following persons with life expectancy as indicated:

| Father, Robert Oscar | 24 years |
| Mother, Lucy Dean | 26 years |
| Illegitimate child, Kimberly Chantee | 65 years |

He graduated from high school in 1967, attended East Texas State for one year and Texarkana Junior College for one semester. He had dated Luverne Cornelius in high school. She became pregnant by him and the child is Kimberly Chantee Smith. He acknowledged that the child was his and he and his parents helped support the child and they actually keep the child in their home a great part of the time.

Luverne Cornelius attempted to prove a common law marriage to John Winston Smith. Common law marriages are

recognized in Texas; the 3 elements thereof being:

1. An expressed or implied agreement between the parties to take each other as husband and wife during their natural lives;

2. Co-habiting as husband and wife; and

3. Holding each other out to the public as his or her respective spouse.

The burden of proving the common law marriage is on Luverne Cornelius.

■ A fair appraisal of the evidence forces the Court to the conclusion that Luverne Cornelius cannot and did not meet the burden of proof. She could only establish that Smith was the acknowledged father of Kimberly and that maybe he was going to marry her when he got out of school. They did not live together as husband and wife and Smith's parents knew of no occasion when they lived together or held themselves out as husband and wife. At the same time the parents accepted Kimberly as their granddaughter, the daughter of John Winston Smith and kept the child in their care a large portion of the time and recognized the duty to support, which John Winston was meeting by payments on a regular basis.

It may be that John Winston Smith intended to marry Luverne and establish a home with her and his child by her, but the proof is lacking under the evidence in this case.

John Winston Smith's salary was $4,160.00 per year.

■ The Court finds that the Personal Representative of his estate should recover the following amount from the defendant:

| | |
|---|---|
| For the Estate of deceased | $15,000.00 |
| For the Child, Kimberly | 45,000.00 |
| For the Mother, Lucy | 20,000.00 |
| For the Father, Robert Oscar | 20,000.00 |

## DAVIS

William Martin Davis was born September 26, 1946. He was survived by the following persons, with life expectancy as indicated:

| | | |
|---|---|---|
| Illegitimate son, | Martin Stacy Davis | 66 years |
| Mother | Dorothy | 28 years |

He was a graduate of high school in Shreveport, Louisiana. He attended Southern University at Baton Rouge working toward a degree in Engineering, lacking only 5 hours of having his degree; he was an instrument man at the time of his death and was earning $5,400.00 per year.

No effort was made to prove a marriage between Davis and the mother of his child. Rather, it was a relationship where Davis' mother, Dorothy, took the pregnant girl into her protection, gave both the girl and the child the care and support required and both she and her son recognized the child, Martin Stacy as his child and that he owed the child the duty of support. The mother of the illegitimate child does not claim that William Martin Davis ever married her or owed her a legal duty of support.

William Martin Davis was an only child of his mother, Dorothy, who is a widow. They had a joint bank account. Both worked and he supported his mother and child in such manner and to the extent that both are entitled to damages for his death.

■ The Court finds that the Personal Representative of his estate should recover from the defendant the following amounts:

| | |
|---|---|
| For the Estate of Deceased | $15,000.00 |
| For the Child, Martin Stacy Davis | 65,000.00 |
| For the Mother, Dorothy | 45,000.00 |

## WORKMEN'S COMPENSATION BENEFITS AS CREDIT TOWARD ANY RECOVERY OF DAMAGES.

■ Ordinarily, the amounts paid as Workmen's Compensation benefits are to be credited against any judgment rendered against the employer under the General Maritime Law. Biggs v. Norfolk Dredging Co., 360 F.2d 360 (4th Cir.); accord Calbeck v. Travelers Ins.

Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed. 2d 368; Newport News Shipbuilding & Dry Dock Co. v. O'Hearne, 192 F.2d 968 (4th Cir.).

The pre-trial order in this case contains stipulations of counsel that reflect that the following Workmen's Compensation benefits have been paid to and accepted by various plaintiffs:

(1) $28.00 per week from May 8, 1969 to date to Mrs. Carolyn Dollarhide, the widow of James Louis Dollarhide;

(2) $12.00 per week from May 8, 1969 to date to Antionette Mechelle Poole, the stepchild of James Louis Dollarhide;

(3) $28.00 per week from May 8, 1969 to date to Mrs. Catherine Spiller, the widow of L. Roy Spiller;

(4) $12.00 per week from July 29, 1969 to date to Jeffrey Leroy Spiller, the posthumous child of L. Roy Spiller;

(5) $750.00 for funeral and burial expenses for John Winston Smith; and

(6) $750.00 for funeral and burial expenses for William Martin Davis.

As of the week beginning May 3, 1971, aggregate payments of weekly Workmen's Compensation benefits will be as follows:

(1) $2,912.00 to Mrs. Carolyn Dollarhide;

(2) $1,248.00 to Antionette Mechelle Poole;

(3) $2,912.00 to Mrs. Catherine Spiller; and

(4) $1,092.00 to Jeffrey Leroy Spiller.

Ordinarily, defendant would be entitled to be credited with these payments against the judgment rendered for the benefit of the respective plaintiffs receiving Workmen's Compensation payments.

However, in this case the Royal Indemnity Company has made the Workman Compensation payments while not a for-mal party to this action. As a matter of fact, it was stated in the trial and concurred in by all parties that Royal Indemnity Company took the position that it afforded no coverage with respect to the claims asserted in admiralty or their defense and denied any applicable coverage and refused to defend for the defendant. It was recognized that if the plaintiffs recovered under their admiralty claims there would be no responsibility under the Arkansas Workmen's Compensation law and contrariwise it was contemplated that if the action in admiralty failed, Royal Indemnity Company would have liability under the Workmen's Compensation law.

Consequently, by agreement with the plaintiff, Royal Indemnity Company made the compensation payments as above set forth with the understanding that out of any recoveries that might be made in the damage suits, Royal Indemnity Company would be reimbursed and made whole with respect to its past and future disbursements under the Workmen's Compensation law.

Because of the circumstances in this case and in view of the fact that the defendant employer has not itself paid the above benefits, judgment should be entered for the full amount in favor of the respective plaintiffs; and upon collection of said judgment repay Royal Indemnity Company or be subject to an action by it.

The costs are to be awarded against the defendant.

An amended and corrected judgment will be prepared and entered.

## JUDGMENT

On this June 11, 1971, comes on for hearing the Motion of Plaintiffs to Alter or Amend the Judgment herein entered on May 11, 1971, and the Court doth find that said Motion should be granted.

It is, accordingly, ordered that the following be and the same is hereby substituted as the Judgment in this case:

That plaintiff Mrs. Carolyn Dollarhide, as administratrix of the estate of

James Louis Dollarhide, deceased, have and recover of and from the defendant Thomas M. Lowe, Jr., & Associates, Inc. as follows: for the estate of James Louis Dollarhide, deceased, the sum of $15,000.00; for the widow, Carolyn, the sum of $50,000.00; for the father, Joseph, the sum of $15,000.00; for the mother, Creola, the sum of $15,000.00; and for the stepchild, Antionette, the sum of $15,000.00, making a total of $110,000.00.

It is further ordered and adjudged that plaintiff, Mrs. Catherine Spiller, as administratrix of the estate of L. Roy Spiller, deceased, have and recover of and from the defendant, Thomas M. Lowe, Jr., & Associates, Inc. as follows: for the estate of L. Roy Spiller, deceased, the sum of $15,000.00; for the widow, Catherine, the sum of $50,000.00; for the child, Jeffrey, the sum of $40,000.00; and for the mother, Elemma, the sum of $15,000.00, making a total of $120,000.00.

It is further ordered and adjudged that plaintiff Robert Oscar Smith, as administrator of the estate of John Winston Smith, deceased, have and recover of and from the defendant Thomas M. Lowe, Jr., & Associates, Inc. as follows: for the estate of John Winston Smith, deceased, the sum of $15,000.00; for the child, Kimberly, the sum of $45,000.00; for the mother, Lucy, the sum of $20,000.00; and for the father, Robert Oscar, the sum of $20,000.00, making a total of $100,000.00.

It is further ordered and adjudged that intervening plaintiff Mrs. Dorothy Norman Davis as Personal Representative of the estate of William Martin Davis have and recover of and from the defendant Thomas M. Lowe, Jr., & Associates, Inc. as follows: for the estate of William Martin Davis, deceased, the sum of $15,000.00; for the child, Martin Stacy Davis, the sum of $65,000.00; and for the mother, Dorothy, the sum of $45,000.00, making a total of $125,000.00.

It is further ordered and adjudged that plaintiffs have and recover of and from the defendant Thomas M. Lowe, Jr., &

Associates, Inc., their costs herein expended, together with interest from and after May 11, 1971, at the rate of six (6%) per centum per annum.