**Vedora STALLWORTH, as Administratrix, etc.**

v.

**Otis McFARLAND et al.**

**Civ. A. No. 13938.**

United States District Court,
W. D. Louisiana,
Shreveport Division.

Oct. 25, 1972.

Donald L. Mayeux, Guillory, Guillory & Guillory, Eunice, La., for plaintiff.

Donald Soileau, John Saunders, Mamou, La., for Otis McFarland.

James L. Davis, Many, La., for Edgar Savell.

W. R. Jackson, Jr., Leesville, La., Wilton H. Williams, Jr., Joseph W. Milner, Blanchard, Walker, O'Quin & Roberts, Shreveport, La., for Sabine River Authority of La.

## OPINION

DAWKINS, Chief Judge.

The basis for this action is a drowning which occurred on Toledo Bend Lake on or about July 18, 1967. The decedent, who could not swim, was one of a group of men who were clearing boat lanes on the lake by use of small boats and power saws. Their procedure was to cut the trees just above water level, this method being resorted to because of unexpected rapidly rising water which prevented the use of bulldozers and crushers.

Decedent, Ernest Stallworth, and his co-worker, Robert McFarland, had quit work for the day. Their fourteen-foot aluminum boat had an outboard motor. They picked up two other workers (this made four in the small boat) and proceeded to the transfer boat. This was a larger boat used to transport the men to and from the boat landing to the work area where they would transfer to smaller boats to do the clearing. When they reached the transfer boat, they were told by a fellow worker to proceed toward the landing in the boat in which they were riding because all of them could not return in the transfer boat. Stallworth, who was operating the boat, although he had not done so before, guided it through a wooded area into a clearing. Shortly after the boat began to "take water" over its bow and within a short period sank. Three of the men survived, but Stallworth never came up and his body was not found until the following day.

The question presented is: Who, if anyone, will bear liability for this accident? This depends upon whom Stallworth was working for at the time of the occurrence. There are four possibilities: Sabine River Authority of Louisiana (SRA), Edgar Savell, Otis McFarland, and Ernest Stallworth himself. Of course, decedent's survivors, who have brought this action, principally contend that decedent was working for SRA, and that the Jones Act and Maritime law require that it be held liable.

Basically, the situation reduces itself to Savell's having submitted a bid to SRA for clearing certain boat lanes at the request of McFarland. The latter contends he was doing nothing more than obtaining work for residents of a small community who were being driven from their homes because of the rising waters of Toledo Bend Lake. McFarland, whose principal work was for Savell's son in hauling logs, pleaded with the elder Savell on behalf of all the men involved to assist them in obtaining work contracts for clearing certain boat lanes. These men knew they would be unable to obtain the contracts themselves because they could not post the bonds required, nor could they purchase workmen's compensation insurance, as was required by this and other similar contracts.

It is thus plainly apparent why these individuals needed Savell's assistance.

The group were Negro men from a rural community in the process of being inundated by rising water. In McFarland's words, they were in need of work to find new homes and they turned to a man who had been a good Samaritan to them in the past. Savell, a white man, had helped these people before and doubtless felt he could assist them again. Savell agreed to bid on the clearing, put up the necessary bonds, and leave the actual clearing to McFarland and his associates.

After SRA gave notice in the area newspapers that bids would be accepted on clearing of boat lanes, Savell, with the help of W. A. Williams, State Representative in the Louisiana Legislature, and member of SRA, prepared a bid that was submitted to SRA. Subsequently, this bid was conditionally approved by SRA and SRA of Texas June 22, 1967.

Thereafter, a resolution authorizing the Chairman and Executive Vice President of SRA "to enter into and sign contracts" [1] in behalf of SRA with bidders whose proposals had been conditionally approved, was passed by the Board of Commissioners. Pursuant thereto, Homer J. Belanger, Secretary and attorney for SRA, prepared and transmitted to Savell by letter dated June 28, 1967, the original and five copies of the "Proposed Contract No. TBP–42" along with an equal number of performance and payment bonds. [2] This letter requested that

1. "Mr. Morgan advised the Board that the Toledo Bend Project Joint Operation had advertised for competitive bids and had received proposals to clear eighteen (18) boat lanes in the Toledo Bend Reservoir which had been inundated and which the present contractors clearing the reservoir had not been able to clear under the existing contracts. The invitation called for proposals to clear eighteen (18) boat lanes working from floating equipment and using power saws to cut the trees. * * * A third bidder, Edgar Savell of Many, Louisiana, submitted a bid to clear Items F. G. J. and L, or Boat Lanes 8, 9, 12 and 14, for One Hundred and No/100 Dollars per acre; * * *.

* * * * *

"A discussion followed, after which it was unanimously resolved that the Chair-

man and Executive Vice President be authorized to enter into and sign contracts on the Board's behalf with the aforesaid bidders, with the exception of Laguna Construction Company, based on their respective bids."

2. "AUTHORITIES and CONTRACTOR mutually agree as follows:

1. The Notice to Contractors
2. The Accepted Proposal
3. The Performance and Payment Bonds, and
4. The Plans and Specifications are all made a part of this contract to the same extent as though repeated herein.

"For the consideration hereinafter shown to be paid by AUTHORITIES, CONTRACTOR agrees, binds and obligates himself, his heirs, successors and

Savell execute the documents and return them for the "remaining signatures." After proper execution, the documents would be recorded as required by law.[3]

After receiving this correspondence, Savell and McFarland entered into a written agreement whereby Savell subcontracted clearing of the boat lanes to McFarland June 10, 1967.[4] The agreement provided that Savell would lend power saws and boats to McFarland and, upon payment of the contract price, Savell would receive $4,000 in cash.

Savell, it seems, was in no hurry to execute the contract received from Belanger, (attorney for the SRA's,) and return same to SRA. Not having received the contract, R. D. Morgan, Project Supervisor for Engineering, requested, July 10, 1967, that Savell expedite execution of the contracts and return them for further processing.[5] Morgan

assigns to furnish all labor and equipment and to do and perform all work required in the clearing of boat lanes in the Toledo Bend Reservoir in Sabine Parish, Louisiana, and Sabine County, Texas, in strict accordance with the plans prepared by the Department of Public Works, State of Louisiana, dated June, 1967, and designated by File No. TB–306–D, and the specifications likewise prepared by said Department and of the same date, but designated by File No. TB–8, which plans and specifications are filed and available in the office of the Department of Public Works, State of Louisiana, State Capitol Annex Building, Baton Rouge, Louisiana, but are made a part of this contract by reference, as aforesaid, and to the AU-THORITIES' complete and entire satisfaction.

\* \* \* \* \*

"The work called for herein shall be done under the direct supervision of the Chief Engineer, Department of Public Works, State of Louisiana, or his representative. It shall be commenced within fifteen (15) calendar days after receipt by CONTRACTOR of notice to proceed, which notice is to be issued by the said Chief Engineer, and completed within eight (8) weeks after receipt of said notice."

3. "Enclosed herewith are the original and five copies of proposed Contract No. TBP–42, between yourself and the Sabine River Authority, State of Louisiana, and the Sabine River Authority of Texas, for clearing boat lanes in the Toledo Bend Reservoir in Sabine Parish, Louisiana, and Sabine County, Texas. Also enclosed are the originals and five copies each of Performance and Payment Bonds for your signature.

"Please be kind enough to sign the original and all copies of the contract and the originals and all copies of the bonds on the lines indicated, being sure to have the bond signed by a qualified representative of a surety company authorized to do business in the States of Louisiana and Texas. This representative must be able to show evidence of his authority to bind the surety in the form of a Power of Autorney.

"After the original and all copies of the contract and the originals and all copies of the bonds have been executed as outlined, kindly return them to this office for the *remaining signatures*. [Emphasis ours.]

"After the contract has been properly executed by the remaining parties, the original thereof together with the original of your bond will be recorded in the Mortgage Records of Sabine Parish as the law requires, and copies will be made available to you and your surety."

4. "I have been informed by the Sabine River Authority of Louisiana has voted [*sic*] to accept my bid of $22,170.00 for clearing of boat lanes on Toledo Lake.

"This is to advise I am sub-contracting (TBP–42) these boat lanes to you for clearing and I will loan or furnish to you any boats or power saws that I have for this purpose. You will furnish the crews, boats, and all other necessary items to complete the clearing. Upon receiving payment of the $22,170.00 for the above clearing contract, (TBP–42) I will be paid $4,000.00 in cash."

5. "On June 28, 1967, Mr. Belanger, Attorney for the Department, sent you a contract for clearing boat lanes on the Toledo Bend Reservoir to be executed. It is important that this work be started in the very near future and accordingly we request that you expedite signing the contracts and return them to us for further processing.

"It is my understanding that you may be having some trouble obtaining bond for this job. If you desire to do the job without performance bond, we will permit you to do so except that no monthly payments will be made. Payment will

again made the same request August 7, 1967. These instruments did not reach Belanger's office until September 1, 1967, and his testimony was that when he received the contract the date of "July 18" had been inserted in the contract form, which was on or about the same date that Stallworth drowned. After execution by SRA and SRA of Texas, a formal work order was issued and the work finally was accepted April 3, 1968.

Understandably, these Negro men were anxious to begin work posthaste. They had agreed among themselves that they would be paid by the acre. The bid price was $100 per acre and each man would receive a proportionate share of payment for work completed after Savell had been paid the $4,000 plus interest he advanced McFarland to obtain necessary equipment. The record and exhibits show that these men banded together for a common cause, and, in the words of those who performed the work, the job was to be done by the "task," i. e., they would not be paid by the hour, but for the job.

With knowledge that they would not be paid anything until a certain amount of work had been completed and notwithstanding that McFarland and his associates were admonished by both W. A. Williams and Savell not to begin work until all requirements in the contract had been fulfilled—bonds posted, affidavit of insurance, and work order issued[6]—these men, including Stallworth, who either had been present when the group was so admonished or should have known from the others who were present when the admonitions were given, began clearing boat lanes in the areas designated by the specifications. There is some dispute as to the exact date of commencement of the work just as there is about the exact date of the drowning.

This action is brought in Admiralty so we must first consider whether Toledo Bend Lake was and is a navigable lake at the area in question. None of the defendants have contested jurisdiction, and we believe the reason for this is because of common knowledge among residents of the area and of almost any person in Louisiana and East Texas that the dimensions of the lake leave no doubt that this vast man-made reservoir (approximately 65 miles long and 12 miles wide at its widest point) which inundates parts of both States is navigable in fact. The test is:

"If (1) It presently is being used or is suitable for use, or (2) It has been used or was suitable for use in the past, or (3) It could be made suitable for use in the future by reasonable improvements." Spiller v. Thomas M. Lowe, Jr. and Assn., Inc., 328 F.Supp. 54 (W.D.Ark., 1971), citing Rochester Gas & Electric Corp. v. FPC, 344 F.2d 594 (2d Cir., 1965).

Incredible as it may seem, after consideration of the jurisprudence, we must find as a fact as did Judge Williams, in Spiller v. Thomas M. Lowe Jr. & Assn., Inc., *supra*, that a small aluminum boat was a "vessel" within the jurisprudential meaning of that term.

Plaintiff contends here she is entitled to recover under the Jones Act and/or the doctrine of unseaworthiness. She alleges that decedent was employed as a seaman by SRA to cut tree tops by virtue of being an employee of either Edgar Savell or Otis McFarland, and being such that SRA could not contract away its responsibilities in performance of the work. Therefore she contends it is liable to plaintiff for the death of her husband.

The Jones Act requires that the employee has rights only against his em-

---

be made upon satisfactory completion of all the work on the contract. It will be necessary that you furnish payment bond as required by the contract."

6. See note 2, *supra*. The contract incorporates other documents which contain these requirements and the contract itself stipulates when work will begin.

ployer and no others.[7] "[T]here is nothing in the Jones Act which grants to seamen a right to bring an action against anyone except his employer. . . ." Roth v. Cox, 210 F.2d 76, 78 (5th Cir., 1954). The injury must be sustained in the course of employment during the employee-employer relationship. Pennington v. Pacific Coast Transport Co., 419 F.2d 122, 124 (5th Cir., 1969). See also Haskins v. Point Towing Co., 421 F.2d 532 (3rd Cir., 1970). The burden of establishing this relationship is upon plaintiff. Bergan v. International Freighting Corp., Inc., 254 F.2d 231 (2d Cir., 1968); Perez v. Marine Transport Lines, Inc., 160 F. Supp. 853 (E.D.La., 1958).

SRA was created by legislative act (La.R.S. 38:2321 et seq.) by the State of Louisiana, and it entered into a joint venture with SRA of Texas. The designated purpose of this venture was the creation of a dam and reservoir to provide electrical power, promote industrial development in both States, conserve water for agricultural purposes, and create fishing, recreation, and commercial development. To achieve such aims, it was necessary to establish means of navigation in the reservoir and this meant that boat lanes had to be cleared to afford access to various recreation areas on the banks of the lake.

■ Plaintiff's demand against SRA depends entirely upon the existence of a contract between Savell and the SRA. We find that no such contract existed at the time of the accident, either express or implied. The only thing that had occurred at the time of the drowning was the bid that Savell had submitted and the conditional approval of such bid by SRA. Savell knew, as the facts show, that he had no contract until all the conditions had been fulfilled. He knew this and he related it to McFarland and the rest of the men. It is basic in Louisiana law that the intentions of the parties control. In this situation, the intention of SRA to contract for this type of operation is controlled by statute.[8]

■ Agents of SRA related this fact to Savell and Savell in turn had no other intention or reasonable belief that the contract would come into existence at any other time. The contract contains many conditions which had to be fulfilled before it could be perfected and such conditions were unaccomplished at the time of the accident. SRA had not accepted or signed the written contract, nor was it in its possession at the time of the drowning. Where the parties intend that there will be a written contract, neither party is bound until the writing is perfected and signed. Sterkx v. Gravity Drainage District No. 1 of Rapides Parish, 214 So.2d 552, 553 (La. App., 3rd Cir., 1968).

■ This conclusion is definitely supported by all the evidence. The notice by which bids were solicited contemplates execution of a contract after bid approval by reciting the necessity of posting a bid bond, forfeiture of which will be effected upon "failure on the part of the successful bidder *to execute*

7. "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."

8. "When any bid is accepted for the construction or doing of any public works, a written contract shall be entered into by the successful bidder and the governing authority letting the contract, and the party to whom the contract is awarded shall furnish good and solvent bond . . . ."

*the contract* and provide satisfactory bond" after the same are submitted for execution.[9] See Leitz v. City of New Orleans, 136 La. 483, 67 So. 339 (1915). The bid form contemplates execution of a contract [10] as do the specifications.[11] The resolution by SRA approving the acceptable bids provides that its officers "be authorized to enter into and sign contracts" with the approved bidders.[12] All correspondence between the authorities of SRA and Savell indicates that no contract had been entered into between the parties. The subcontract executed between Savell and McFarland stated that the bid had been accepted and not that the contract had been executed.

From a careful review of the testimony it is clear that the contract was sent to Savell undated and that when it was returned to Belanger the date of July 18 had been pre-dated in the blank for the effective date of the contract—and that was on or about the same date Stallworth drowned. It is well settled that in circumstances such as these it may be shown that an instrument was in fact made, executed, and delivered at a date subsequent to that stated on its face. District of Columbia v. Camden Iron Works, 181 U.S. 453, 461, 21 S.Ct. 680,

45 L.Ed. 948 (1901); Ohio Casualty Insurance Co. v. Heaney, 229 F.Supp. 30 (N.D.Ill., 1964); 30 Am.Jur.2d, Evidence § 1039 (2d Ed.1967).

Alternatively, plaintiff contends that, if there was in fact no contract at the time of the occurrence, SRA encouraged such work to begin, notwithstanding that there was no contractual relationship. Plaintiff falls woefully short in showing that SRA did in fact encourage beginning such work activity. The letter of July 10, 1967, from Morgan to Savell is perfectly clear—especially with regard to the performance and payment bonds, that there was something important remaining to be done before it was a confected contract. SRA did not instruct, authorize, or encourage anyone to begin work before a contract had been executed and a work order issued. Nor does plaintiff's contention that H. W. Parent, an engineering aide, had knowledge of the work being done prior to the drowning convince us that Parent knew this. One of plaintiff's witnesses who testified that Parent saw them working, in this Court's opinion, was not worthy of credibility and the other witness offered to support this view had made prior or contradictory statements concerning

9. "The Bid Bond or deposit shall be subject to forfeiture upon failure on the part of the successful bidder to execute the contract and provide satisfactory bond within ten (10) days after such contract and bond are submitted to the said successful bidder for execution."

10. "We (or I) herewith enclose Cashier's Check for $1,108.50 as deposit, and agree to execute within ten (10) days after receipt of written notice of acceptance of this bid, a contract with the Sabine River Authorities, in accordance with the bid as accepted and to give the required bond with good and sufficient surety for the faithful performance of the contract and for the protection of all persons supplying labor and materials in the prosecution of the work.
   "Performance of work at the site, will begin within a period of fifteen (15) calendar days after receipt of notice to proceed, and will be completed in accordance with the provisions of the specifications."

11. "If the Authorities shall accept the bid of the Contractor and the Contractor shall enter into a contract with the Authorities, the Contractor agrees to furnish Performance and Payment Bonds in amounts equal to one hundred (100%) percent of the amount of the contract price. The bonds shall be on the forms prescribed by the Authorities and with acceptable corporate surety (ies) authorized to do business in the States of Texas and Louisiana. Such bonds shall be properly countersigned by a resident agent of both Texas and Louisiana.
   "Should the successful bidder fail or refuse to execute the contract and furnish the required bonds within 30 days after being notified by Authorities of their acceptance of his bid, the bid surety will be forfeited by Authorities and the contract awarded to the next qualified low bidder."

12. See note 1, *supra*, second paragraph.

this. Also, another of plaintiff's own witnesses, Leon Williams, as to whose testimony this Court was and is highly skeptical, and Otis McFarland testified they did not see Parent in any area in which they were working. Reinforcing this view is the testimony of Parent himself who denied being aware of any work conducted on the boat lanes within the area of Savell's bid prior to the drowning.

Consequently, we conclude that at the time of the drowning there was no employer-employee relationship between SRA and Stallworth.

▮ Nor does the doctrine of unseaworthiness pertain to SRA in this situation, for it had no connection whatever with the vessel. It is only the owner or operator of a vessel who owes a seaman the obligation to provide a seaworthy vessel, and in no wise can SRA be considered in either capacity here. It was in no way connected with any of the persons owning or operating the boat.

We now consider whether Stallworth was McFarland's employee. The facts completely support McFarland's testimony as to the relationship among the individuals involved. The evidence reveals that each person involved knew he was not an employee of McFarland and that he was merely helping them obtain work as a joint venture and was doing so by organizing the whole operation. He paid no one for cutting boat lanes because the understanding was that each person was working for himself.

Plaintiff attempts to support her contention that these men were employees of Savell by the existence of checks to several of them signed by Savell. This allegation is conclusively refuted by the testimony of those who received the checks, McFarland's business records and Savell's testimony—all of which showed that the checks were issued for hauling logs—not for clearing boat lanes. In fact, one of plaintiff's own witnesses stated that he had never been paid anything for the amount of work

he did in clearing boat lanes, and the reason for this was because of the work arrangement and the fact that the work was never completed.

▮ The situation thus resolves itself to these men—including Stallworth—knowing that before they would get paid anything they had to finish the job. With this in mind, they decided to start clearing prematurely without a contract and thereby have the work partially completed when and if the contract was perfected, which they hoped would enable them to get their money more quickly. If they waited for the contract to be signed, then it would be that much longer before they were finished and this would retard their receiving payment for the job. Therefore, we conclude that these men, who were working for themselves and with knowledge of mere bid approval—not a firm contract—began work on their own and with knowledge explicitly that they had been directed not to do what they were in fact doing—in direct violation of verbal warnings not to begin the job until a work order was issued. Therefore, Stallworth was not an employee of either Savell or McFarland, and the Jones Act does not grant him, or his survivors, recourse against either.

▮ Nor do we consider Stallworth to have been anything more than a volunteer, trying to obtain some work, and at the time was a mere trespasser upon the reservoir or work area; and, if the Jones Act applies only to employees, *a fortiori*, it affords no protection to volunteers or trespassers. 32 Am.Jur.2d, Federal Employers' Liability § 44 (2d Ed.1967), citing Duarte v. Christie, Scow Corp., 27 F.Supp. 897 (S.D.N.Y., 1939) and The Western World, 31 F. Supp. 340 (E.D.N.Y., 1940). "Nor does the Act create any rights in favor of one whose relationship with the owner or operator of a vessel is that of a partner or *an* independent contractor." Am.Jur.2d, *supra.*

▮ We also fail to see the slightest applicability of the doctrine of unsea-

worthiness against McFarland or Savell. Savell was not the owner or operator of the boat, so he in no way could be obligated to provide a seaworthy vessel. Davis v. Associated Pipe Line Contractors, Inc., 305 F.Supp. 1345 (W.D.La., 1968), aff'd, 418 F.2d 920 (5th Cir., 1969), cert. denied, 397 U.S. 988, 90 S. Ct. 119, 25 L.Ed.2d 396 (1970). McFarland borrowed the boat from a friend in order that the group of men could have its use and the operator of the boat was whoever controlled the attached 7½ horsepower outboard engine, who happened to be Stallworth himself at the time of the accident. McFarland was neither the owner nor operator of the boat at the time of the accident. Therefore, neither McFarland nor Savell owed Stallworth the duty to provide a seaworthy vessel.

Moreover, we decline to consider applicability of the State workmen's compensation claim because of lack of diversity.

Counsel for defendants will prepare and submit an appropriate order in accordance herewith pursuant to our Local Rule 9.